# Illinois Official Reports

## Appellate Court

***People v. Guyton*, 2014 IL App (1st) 110450**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KASEY GUYTON, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-11-0450 |
| Filed | July 15, 2014 |
| Rehearing denied | May 4, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions and sentences for second degree murder, attempted first degree murder and unlawful use of a weapon by a felon arising from an altercation following a vehicular collision between a van driven by the murder victim and defendant's car were upheld on appeal and defendant's conviction for aggravated discharge of a firearm was vacated pursuant to the one-act, one-crime doctrine where defendant had the requisite intent to be convicted of the second degree murder of the van's driver and the attempted first degree murder of the van's passenger, the trial court did not err in limiting defendant's use of *Lynch* evidence concerning the victims' aggressive and violent character, the 20-year add-on to defendant's sentence for attempted first degree murder did not violate due process or equal protection in the absence of a showing that the sentence was disproportionate to the offense or was not reasonably related to deterring the use of firearms, defendant's sentences were not excessive, and his counsel was not ineffective in failing to request a reduction in the sentences based on provocation by the victims. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-22501; the Hon. John P. Kirby, Judge, presiding. |

| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Jonathan Krieger, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE PIERCE delivered the judgment of the court, with opinion. Presiding Justice Harris and Justice Liu concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant Kasey Guyton was convicted of second degree murder, attempted first degree murder, and aggravated discharge of a firearm. In a simultaneous bench trial, defendant was convicted of unlawful use of a weapon by a felon. Defendant was subsequently sentenced to 18 years' imprisonment for second degree murder and 16 years' imprisonment for attempted first degree murder with a 20-year mandatory add-on for the personal discharge of a weapon, and 6-year concurrent terms for aggravated discharge of a firearm and unlawful use of a weapon by a felon. On appeal, defendant argues: (1) his convictions for second degree murder and attempted first degree murder are inconsistent; (2) the trial court improperly limited his presentation of *Lynch* material (*People v. Lynch*, 104 Ill. 2d 194 (1984)); (3) his sentence for attempted first degree murder is unconstitutional because it shocks the conscience and violates equal protection and due process; (4) his sentence for attempted first degree murder is unconstitutional because the firearm add-on imposed is not reasonably related to the aim of deterring firearm use and thus violates due process; (5) his sentences for attempted first degree murder and second degree murder are excessive; (6) counsel was ineffective for failing to request defendant's sentence for attempted first degree murder be reduced based on provocation; and (7) his conviction for aggravated discharge of a firearm violates the one-act, one-crime doctrine and should be vacated. For the following reasons, we affirm the judgment of the trial court but vacate defendant's conviction for aggravated discharge of a firearm.

¶ 2                                BACKGROUND

¶ 3    Defendant was charged by way of indictment with first degree murder, attempted first degree murder, aggravated discharge of a firearm, and unlawful use of a weapon by a felon. At trial, Edner Flores testified that at 7:30 p.m. on August 22, 2006, he was a passenger in a van

being driven by Adam Saldivar, which collided with defendant's Grand Marquis at the intersection of Leclaire and Augusta in Chicago. Both Saldivar and the driver of the Grand Marquis, whom Flores identified as defendant, exited their cars. Flores remained in the passenger seat. Although Flores could hear their voices, he could not hear what Saldivar and defendant were saying. He could hear that they were yelling. After a few minutes, Saldivar got back into the van and they drove south on Leclaire, while defendant returned to his car and drove east on Augusta.

¶ 4        Saldivar followed several one-way streets to get back around to Augusta. There, he stopped briefly to assess the damage to the van. Saldivar then drove to the intersection of Augusta and Lawler, one block east of the initial accident. Saldivar stopped at the stop sign and then proceeded through the intersection. Flores then heard six or seven shots but could not tell where they were coming from. He felt a burning sensation in his upper back and looked at Saldivar. Saldivar appeared to be in "shock" and lost control of the van, hitting an oncoming car and crashing into a brick building.

¶ 5        Flores jumped out of the van and ran toward a young woman on a nearby front porch. He asked her to call the police. Flores went home, changed his shirt, went to Saldivar's house to tell Saldivar's family what had happened and returned to the scene with Saldivar's family. Flores spoke to the police and then went to the police station where he saw a little burn mark in the middle of his back. Flores identified defendant in a photo array and a lineup as the man from the accident.

¶ 6        David Johnson testified that he lived near the intersection of Augusta and Leclaire and was outside at 7:30 p.m. on August 22, 2006. He witnessed a collision between a maroon van and blue car. He walked toward the scene and heard the drivers of the two vehicles arguing over who was at fault. Johnson saw a passenger in the van but the passenger never got out. After they were done arguing, the men got into their cars and drove away. Johnson then saw the van as it returned to the area. As the van made a left turn from Lawler onto Augusta, Johnson saw defendant, who was standing by a tree on the southwestern corner of the intersection holding a semiautomatic pistol, step out and shoot at the van. He heard four or five shots. The van then struck another car and crashed into a building. The driver of the van was slumped over the steering wheel and the passenger fled west on Augusta. Johnson saw defendant get into a car and drive east. Johnson had seen defendant in the neighborhood several times and knew that he lived on the corner of Leclaire and Augusta. Johnson did not see anyone in the van shoot at defendant.

¶ 7        Johnson did not talk to the police until three days later, when he flagged down an officer he knew. He identified defendant as the shooter in a photo array and in a lineup. Johnson admitted that he had three prior convictions for drug offenses and admitted that he was a heroin addict. He also testified that although he worked as a confidential informant for the police in other cases, he was not paid in this case.

¶ 8        Eric Smith testified that he knew defendant from the neighborhood and knew that he drove a sky blue Grand Marquis. On August 22, 2006, he saw defendant twice at the intersection of Augusta and Lawler. The first time he saw defendant, defendant pulled up, parked his car, got out and knocked on the window of a building, got back in his car and drove off. About an hour later, Smith saw defendant, who had a young woman in his car, park in the same location. Smith left and returned a few minutes later. When he came back, he heard a commotion on the corner. When he approached, he saw that defendant's car had been hit. He heard defendant say,

"this motherfucker is going to pay." Defendant went into his car and returned with a gun in his hand. Smith saw defendant walk southbound on Lawler. Defendant stopped, and "tucked" himself behind a big tree on the corner. Smith saw a maroon van approach the stop sign on the corner and as the van was about to turn westbound on Leclaire, Smith heard a gunshot from behind the tree and saw defendant with a gun in his hands. Smith saw defendant bang on the gun and fire several more shots. The shots were fired at the passenger side back window of the van. Smith did not see anyone in the van point anything out of the window. The van struck another car and crashed into a building. The passenger of the van jumped out and ran. He had nothing in his hands.

¶ 9        Defendant jumped into the passenger side of his car and took off. Smith talked to police on August 30, 2006, after he was stopped by the police when he ran from them. Smith had a prior felony conviction for delivery of a controlled substance.

¶ 10       Eardia Basset was driving eastbound on Augusta at approximately 7:45 p.m. on August 22, 2006. She was on her way to her son's house and her granddaughter sat in the backseat of her car. As she was about to turn onto Lawler, she heard a "pow" and then heard it again. She told her granddaughter to get low in the seat. She then saw a van come around the corner, heard another shot and saw the van crash into her car on the driver's side.

¶ 11       She looked to where she heard the shots coming from and saw defendant standing on the southeast corner of Lawler and Augusta with a gun in his hand, firing at a maroon-colored van. Neither the driver nor the passenger in the van had a gun, and they were not yelling. The passenger got out of the van and ran west, then north. Eardia identified defendant as the shooter in a photo array and in open court.

¶ 12       Forensic investigator Donald Fanelli arrived at the scene at about 8:30 p.m. and took video and photographs of the area. Investigator Fanelli observed a white painted tree on Lawler and saw four fired cartridge cases and a live unfired bullet on the ground by the tree. All five cartridges were Winchester 9-millimeter Luger. He also observed a bullet hole in the house on the corner of Lawler and Augusta, as well as a hole in the fence.

¶ 13       Investigator Fanelli also observed that the window on the passenger side of the maroon van was broken and that Saldivar was still inside the van, lying between the seats. A baseball bat was found under the front passenger seat of the van. A bullet was recovered from the back of the front passenger seat.

¶ 14       Detective Anthony Noradin arrived at the scene and saw Saldivar lying in the front seat of the van. On August 25, 2006, Detective Noradin showed Eardia Bassett and Edner Flores a photo array and both witnesses identified defendant. Bassett, Flores, Smith and Johnson all identified defendant from lineups.

¶ 15       Assistant Cook County Medical Examiner Michel Humilier conducted an autopsy on Saldivar on August 23, 2006, and observed an irregular gunshot wound entrance to the back of defendant's head. Dr. Humilier opined that the cause of death was a gunshot wound and the manner of death was homicide.

¶ 16       Defendant's girlfriend Stephanie Sims testified that defendant arrived at her apartment in Calumet City between 9 p.m. and 10 p.m. on August 22, 2006. He drove his Mercury Marquis. After defendant spent the night, Sims drove defendant to work in the morning because his car had a flat tire. Defendant's car remained in the parking lot.

- 4 -

¶ 17    On September 1, 2006, she found a gun under some mattresses in the second bedroom of her apartment. Sims put the gun in a plastic bag and called police. When officers arrived, Sims gave written consent for officers to search her apartment. The officers recovered the loaded Beretta 9-millimeter black handgun that Sims had found. The weapon and nine bullets were inventoried the following day by Chicago police. Chicago police detective DeSalvo also observed a blue Mercury Marquis in the parking lot of Sims' apartment building and had the vehicle towed.

¶ 18    Marc Pomerance, a firearm and tool expert, examined the firearm recovered, and after test firing the weapon, concluded that all four fired cartridge cases recovered at the scene were fired from the weapon recovered from Stephanie Sims' apartment.

¶ 19    The State rested. Defendant's motion for a directed verdict was denied.

¶ 20    Defendant testified that on August 23, 2006, he lived with his mother at 5105 West Augusta and owned a blue Grand Marquis. He had taken his son Maliek to get something to eat and as they approached the intersection of Augusta and Leclaire going east, a van turned right in front of him and they collided. The passenger, who was hanging out of the van's window and the driver of the van, told him to "pull the fuck over."

¶ 21    Defendant and the driver of the van got out of their vehicles. Defendant testified that the van's driver said, "[W]here the fuck you come from? I didn't see you." The van's driver told defendant that the collision was defendant's fault and the two men argued. The van's driver was standing in a fighting stance. Defendant told the driver that he had insurance and the driver should call the police. While they were arguing, Flores got out of the van and started yelling at defendant. Flores told defendant that he caused the accident and pulled a black gun out from his shirt. Flores told defendant that either defendant would pay or Flores would take his car. Flores repeated that statement a second time.

¶ 22    Saldivar and Flores got back into the van but told defendant, "[t]his shit ain't over with, on nation" and that they were coming back. Saldivar drove off. Defendant took his son to his mother's house and parked his car on Augusta and Lawler. He took his gun from his car and began to walk home. As he was walking, he saw Saldivar's van approaching and feared the van would hit him so he walked south on Lawler. When he was near a tree, he saw Flores reach down with his right arm. As Flores put his arm back up, defendant fired his gun at the van. Defendant testified that he thought Flores was going to shoot him. After he shot into the van, he ran to his car and drove to his girlfriend's house in Calumet City. He spent the night and left his gun there.

¶ 23    On cross-examination, defendant admitted that he had told police that he had not been in an accident.

¶ 24    Pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), Flores was recalled in defendant's case in chief. Flores testified that he was convicted of battery in 2009. In May 2005, Flores was outside of a gas station putting his son in a car seat when a car pulled in quickly and almost hit him. A man got out of the car and came directly at Flores. Flores punched him in the face, knocking the man to the ground. Flores testified that he did not know the man was blind. He was subsequently arrested but the case was ultimately dismissed.

¶ 25    Aaron Pawlow, the blind man that Flores punched, testified that he was considered legally blind but did have partial vision in one eye. He testified that on May 14, 2005, he was with his 82-year-old mother, who was trying to pull into a parking spot in a gas station when she said

that someone was standing too close to the spot. His mother spoke to the person through her open car window and asked him to move over so she could pull in. That person was later identified as Edner Flores. Flores responded that she had plenty of room. His mother felt uncomfortable so she asked Flores to move again. The third time she asked, Flores started screaming at her. Pawlow got out of the car, tried to unfold his cane, and walked up to Flores. Pawlow told Flores that he was blind and then felt something hit him on the head. Pawlow fell to the ground and Flores sat on his chest and punched him in the eye. Pawlow was treated at the hospital for a hemorrhage in his eye.

¶ 26    Isaias Castaneda also testified pursuant to *Lynch*. On June 9, 1997, he was in a car of several people when a car pulled up next to them and a guy named "Low Rider" got out and started shooting at them. Castaneda could not remember "Low Rider's" name and when defense counsel showed Castaneda a picture, the court sustained the State's objection. Defendant was unable to establish that Saldivar was "Low Rider."

¶ 27    Defendant then introduced a certified copy of Adam Saldivar's conviction for aggravated discharge of a firearm in October 1997 and a certified copy of Edner Flores' conviction for battery causing bodily harm in May 2009.

¶ 28    In rebuttal, the State played a portion of the videotape of defendant's interrogation following his arrest. In that portion of the videotape, defendant denied being involved in a car accident on August 22, 2006, and stated that his car was in the shop on that date. The State presented a certified copy of a vehicle record showing a 1990 Mercury registered to defendant.

¶ 29    Following deliberations, the jury returned a verdict of guilty of second degree murder, attempted first degree murder, and aggravated discharge of a firearm. The jury found that defendant had personally discharged a firearm during the attempted murder. Defendant was also found guilty of unlawful use of a weapon by a felon. Defendant was sentenced to a total of 54 years' imprisonment. It is from this judgment that defendant now appeals.

¶ 30                            ANALYSIS
¶ 31                        I. One Act, One Crime
¶ 32    Defendant argues that because all of the charges arose from his shooting into the van and the State did not differentiate between the different shots fired, his conviction for aggravated discharge of a firearm should be vacated because it violates the one-act, one-crime rule. The State agrees and responds that although defendant committed a series of closely related but separate acts when he fired five shots at the van, the State did not apportion those shots in the indictments so that each formed the basis of a separate offense.

¶ 33    Under the one-act, one-crime rule, multiple convictions arising out of a single physical act are prohibited. *People v. King*, 66 Ill. 2d 551 (1977). We therefore vacate defendant's conviction for aggravated discharge of a firearm. *People v. Garcia*, 179 Ill. 2d 55, 71 (1997) (under the one-act, one-crime rule, a sentence should be imposed on the more serious offense and the conviction on the less serious offense should be vacated).

¶ 34                            II. Verdicts
¶ 35    Defendant argues that the jury verdicts in this case reflect that defendant thought he was acting in self-defense when he committed the shooting. Therefore, he could not have the

requisite intent to be convicted of both attempted first degree murder and second degree murder and his attempted first degree murder conviction must be vacated.

¶ 36    The standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). It is not the function of the reviewing court to retry the defendant or substitute its judgment for that of the trier of fact. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). The trier of fact assesses the credibility of the witnesses, determines the appropriate weight of the testimony and resolves conflicts or inconsistencies in the evidence. *People v. Naylor*, 229 Ill. 2d 584, 614 (2008). The trier of fact is not required to disregard inferences that flow from the evidence or search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 332 (2000). A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009). Defendant's conviction will not be reversed on review simply because he claims a witness was not credible or the evidence was contradictory. *Id*. at 228.

¶ 37    Defendant was charged with the first degree murder of Adam Saldivar and attempted first degree murder of Edner Flores. To sustain a conviction for first degree murder the State must prove that a defendant killed an individual without lawful justification and in performing the acts which caused the death, he intended to kill or do great bodily harm or knew that his acts created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2006). Once the State has proven all of the elements of first degree murder, the burden shifts to the defendant who wishes to mitigate the offense to second degree murder, to prove the existence of one of the statutory mitigating factors by a preponderance of the evidence. See 720 ILCS 5/9-2(c) (West 2006); *People v. Lopez*, 166 Ill. 2d 441, 447 (1995).

¶ 38    First degree murder may be reduced to second degree murder when either of the following mitigating factors is present:

"(1) [Provocation] At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or

(2) [Imperfect self-defense] At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [Justifiable Use of Force; Exoneration], but this belief is unreasonable." 720 ILCS 5/9-2(a)(1), (a)(2) (West 2006).

¶ 39    In this case, defendant argued that the first degree murder of Adam Saldivar should be mitigated to second degree murder because he acted in self-defense. The jury agreed. Second degree murder is a "lesser mitigated offense" of first degree murder and is distinguished from self-defense only in terms of the nature of the defendant's belief at the time of the killing. (Emphasis omitted.) *People v. Jeffries*, 164 Ill. 2d 104, 122 (1995) (citing *People v. Newbern*, 219 Ill. App. 3d 333, 353 (1991)). If the defendant's belief at the time of the killing was reasonable, self-defense may apply; if the defendant's belief was unreasonable, a conviction for second degree murder may be appropriate. *People v. Hooker*, 249 Ill. App. 3d 394, 403 (1993). Here, the jury found defendant's belief in the need for self-defense to be unreasonable and convicted him of second degree murder.

¶ 40    Guyton was also charged with the attempted first degree murder of Flores. To be convicted of attempt, the State must prove beyond a reasonable doubt the intent to commit a specific offense, in this case first degree murder. 720 ILCS 5/8-4(a) (West 2006). Defendant claims that no reasonable argument exists that his mental state changed between when he fired the bullet that hit and killed Saldivar, which resulted in a second degree murder conviction, and when he fired the bullet that hit and injured Flores, which resulted in an attempted murder conviction. In short, defendant argues that he cannot have had an unreasonable belief in the need for self-defense as to Saldivar, but not as to Flores.

¶ 41    There is no difference between the mental states required to prove attempted first degree murder and second degree murder. First degree murder and second degree murder share the same elements, including the same mental states, but second degree murder requires the presence of a mitigating circumstance. *Jeffries*, 164 Ill. 2d at 121-22. The presence of a mitigating factor does not negate the mental state of murder because mitigating factors are not elements of the crime. *Jeffries*, 164 Ill. 2d at 121.

¶ 42    In *People v. Lopez*, 166 Ill. 2d 441 (1995), our supreme court held that the offense of attempted second degree murder does not exist in Illinois because:

> "[T]he crime of attempted second degree murder would require the intent to commit the specific offense of second degree murder. Thus, the intent required for attempted second degree murder, if it existed, would be the intent to kill without lawful justification, plus the intent to have a mitigating circumstance present. However, one cannot intend either a sudden and intense passion due to serious provocation or an unreasonable belief in the need to use deadly force. Moreover, concerning the mitigating factor of an imperfect self-defense, one cannot intend to unlawfully kill while at the same time intending to justifiably use deadly force. Thus, the offense of attempted second degree murder does not exist in this State." *Id*. at 448-49.

¶ 43    Writing separately, Justice McMorrow predicted the precise conundrum presented here: absent a crime of attempted second degree murder, a defendant could be punished more severely if the victim lives than if the victim dies. *Id*. at 452-53 (McMorrow, J., concurring in part and dissenting in part, joined by Bilandic, C.J.) (quoting Timothy P. O'Neill, *"With Malice Toward None": A Solution to an Illinois Homicide Quandary*, 32 DePaul L. Rev. 107, 107-08 (1982)). Despite Justice McMorrow's prescience, the majority rejected a state constitutional challenge to the sentencing differential where a victim dies and where the victim survives and suggested that any changes to the attempt statute to allow attempted second degree murder would have to originate with the legislature. *Id*. at 450.

¶ 44    Almost 15 years after *Lopez*, the legislature addressed the sentencing disparity addressed by Justice McMorrow, but only with respect to serious provocation by adding subsection 8-4(c)(1)(E) (see Pub. Act 96-710 (eff. Jan. 1, 2010) (adding 720 ILCS 5/8-4(c)(1)(E))), which states:

> "[I]f the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the attempted murder is the sentence for a Class 1 felony[.]" 720 ILCS 5/8-4(c)(1)(E) (West 2010).

- 8 -

¶ 45    The legislature could have easily addressed the issue of whether imperfect self-defense would be a mitigating factor in an attempted murder situation by adding such language when it made the above amendment, but chose not to. The legislature is presumed to know of judicial interpretation of statutes; thus, its inaction suggests agreement with the judicial interpretation of *Lopez* (*In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381, 388 (1992); *People v. Agnew*, 105 Ill. 2d 275, 280 (1985)) and further suggests a decision not to provide a mitigating factor of imperfect self-defense to attempted second degree murder. Should our presumption be incorrect, the legislature again has the opportunity to consider whether subsection 8-4(c)(1)(E) should be amended to allow proof of imperfect self-defense as a basis for mitigation of a sentence for the crime of attempted murder.

¶ 46    The jury's verdict on second degree murder in this case indeed shows that it found defendant acted under the unreasonable belief in the need for self-defense as to Saldivar. Because there is no offense of attempted second degree murder, the jury could not be instructed and could not find the defendant guilty of attempted second degree murder of Flores based on the same unreasonable belief in the need for self-defense. In other words, because the defendant did not actually kill Flores, the legislature determined he could not lawfully mitigate his attempt to murder him because he had the same unreasonable belief in the need for self-defense. Defendant's mental state at the time of performing the act giving rise to the attempted murder of Flores and the second degree murder of Saldivar was the same. The evidence established, and the jury found, the intent required to sustain an attempted first degree murder conviction. The determination by the jury that mitigating circumstances existed to allow for a conviction of a lesser second degree murder offense because of defendant's unreasonable belief in the need to defend does not invalidate the attempted murder conviction. Consequently, defendant's argument fails and his conviction for attempted first degree murder stands.

¶ 47                                        III. *Lynch* Evidence

¶ 48    Defendant argues that the trial court denied him his right to present a defense by limiting and delaying his use of *Lynch* evidence. Although the trial court allowed defendant to introduce the prior violent acts by the two victims pursuant to *Lynch*, 104 Ill. 2d 194, the court ruled that the evidence could only be brought in during the defense case and could not be elaborated on in opening statements. Defendant argues that these limitations robbed important defense evidence of its power, amounting to reversible error.

¶ 49    In *Lynch*, our supreme court held that when a defendant raises self-defense as a theory in his case, evidence showing the victim's aggressive and violent character is relevant to show: (1) the defendant's knowledge of the victim's violent tendencies affected his perceptions of and reactions to the victim's behavior; or (2) to support the defendant's version of the facts when there are conflicting versions of events. *Id.* at 200. "Under the first approach, evidence is relevant only if the defendant knew of the victim's violent acts. Under the second approach, the defendant's knowledge is irrelevant." *People v. Nunn*, 357 Ill. App. 3d 625, 631 (2005).

¶ 50    The question of whether defendant could present evidence of Saldivar's and Flores's prior aggressive behavior under *Lynch* was litigated extensively prior to, during, and after trial. In a pretrial motion, defense counsel indicated that defendant would raise a claim of self-defense at trial. Counsel moved to admit six prior acts by Saldivar and Flores to prove that the men were the aggressors. The court allowed four of the acts, including Flores's 2005 battery of a blind

man. During trial, the court also allowed Flores's separate 2009 battery conviction. However, the court prevented defendant from admitting any evidence of self-defense in the State's case in chief. The court stated, "[i]f [defendant] testifies at self-defense [*sic*], then it's opened up and all those prior bad acts come in." The court also limited reference to *Lynch* material during opening statements and barred the defense from mentioning "specific facts" about the acts.

¶ 51　　No issue has been raised regarding whether the *Lynch* evidence introduced in this case was proper. The issue is whether the trial court erred when it ruled that the defense had to bring up the issue of self-defense in its case in chief before any *Lynch* evidence could be introduced.

¶ 52　　A plain reading of *Lynch* establishes that the introduction of *Lynch* evidence is not proper until a defendant introduces evidence of self-defense. *Lynch*, 104 Ill. 2d at 204 ("a defendant may not introduce evidence of the victim's character until some evidence has been presented that the victim was, or appeared to be, the assailant, and that the defendant therefore acted in self-defense"); see also *Nunn*, 357 Ill. App. 3d at 631. The reason for the rule is to ensure that such character evidence is not admitted unless self-defense is at issue in the case. *People v. Allen*, 50 Ill. 2d 280, 284 (1972). In some instances *Lynch* evidence may be properly admitted prior to the defense's case in chief; however, "[t]he order of proof is within the discretion of the trial judge, who, in the interest of convenience and efficiency, might properly [decide] to allow the proof out of the usual order." *Lynch*, 104 Ill. 2d at 205. There is no indication in this case that the trial court abused its discretion in choosing to limit the order of proof. We therefore cannot find that the trial court erred in preventing *Lynch* evidence from being presented prior to the defense's case in chief.

¶ 53　　　　　　　IV. 20-Year Add-On Violates Due Process and Equal Protection

¶ 54　　Defendant argues that the 36-year sentence he received for attempted first degree murder, which included a 20-year add-on because he personally discharged a firearm during the offense, is unconstitutional. Specifically, defendant argues that his sentence for attempted murder is unconstitutional because it shocks the conscience to punish an attempted killing more severely than the completed offense of first degree murder and the harsher treatment of an inchoate offense also renders the sentence unreasonable, violating principles of equal protection and due process.

¶ 55　　We begin with the presumption that all statutes are constitutional. *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). As a result of this presumption, the party challenging the constitutionality of a statute bears the burden of demonstrating that a constitutional violation exists. *Id.* Great deference is given to the legislature's determination of the seriousness of various offenses and the sentences that the legislature has deemed appropriate for those offenses. *Id.* We review the question of whether a statute is constitutional *de novo*. *Id.* at 486-87.

¶ 56　　The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In assessing an alleged proportionate penalties violation, we must determine whether the penalty at issue has been set by the legislature according to the seriousness of the offense. *Sharpe*, 216 Ill. 2d at 487. There are currently two ways to determine whether a penalty will violate the proportionate penalties clause: (1) whether the penalty is cruel, degrading, or so wholly disproportionate to the offense committed

as to shock the moral sense of the community; and (2) whether offenses with identical elements are given different sentences. *Sharpe*, 216 Ill. 2d at 517, 521.

¶ 57 Defendant's challenge, made pursuant to the first test, is that the sentence imposed for attempted murder in this case, 16 years' imprisonment plus a 20-year add-on because he used a firearm for a total of 36 years' imprisonment, violates due process and is grossly disproportionate to the offense, especially considering that his sentence for attempted murder was twice the sentence he received for actually killing Saldivar. Defendant claims "[i]t offends any sense of proportionality to impose twice the punishment on an offender for a victim who sustained a minor injury than for a victim who was killed."

¶ 58 Effective January 1, 2000, the legislature enacted Public Act 91-404. The purpose was "to deter the use of firearms in the commission of a felony offense." Pub. Act 91-404, § 5 (eff. Jan. 1, 2000) (adding 720 ILCS 5/33A-1(b)(1)). Intending to deter the use of dangerous weapons and firearms during the commission of a felony offense, the legislature increased the penalties for certain offenses when the offender is armed with a dangerous weapon other than a firearm, possesses a firearm, discharges a firearm, and discharges a firearm that causes great bodily harm, permanent disability, disfigurement or death. These additional penalties are commonly referred to as "15/20/25-to-life" sentencing provisions. *People v. Moss*, 206 Ill. 2d 503, 506 (2003).

¶ 59 Our supreme court in *People v. Morgan*, 203 Ill. 2d 470, 488-89 (2003), ruled that it is neither cruel nor degrading, nor would it shock the moral sense of the community, to apply the 15/20/25-to-life enhancements to attempted first degree murder. Subsequently in *Sharpe*, the court affirmed its holding in *Morgan* with respect to the 15/20/25-to-life enhancements and stated:

> "We conclude that it would not shock the conscience of the community to learn that the legislature has determined that an additional penalty ought to be imposed when murder is committed with a weapon that not only enhances the perpetrator's ability to kill the intended victim, but also increases the risk that grievous harm or death will be inflicted upon bystanders. See *Morgan*, 203 Ill. 2d at 488-89; *Hill*, 199 Ill. 2d at 452-53 (rejecting 'shock the conscience' challenge to Public Act 91-404 enhancements to home invasion)." *Sharpe*, 216 Ill. 2d at 525.

¶ 60 In *Lopez*, 166 Ill. 2d 441, the defendant argued that because Illinois does not recognize the crime of attempted second degree murder, it was a possibility that a defendant would be sentenced to a greater term of imprisonment if the victim lived than if the victim died. Lopez argued that had he actually killed his wife and the jury believed he acted under a sudden and intense passion due to serious provocation, he would have been guilty of second degree murder, a Class 1 felony that was punishable by a term of imprisonment ranging from 4 to 15 years (720 ILCS 5/9-2(d) (West 1992); 730 ILCS 5/5-8-1(a)(4) (West 1992)), instead of attempted first degree murder that was a Class X felony punishable by a term of imprisonment ranging from 6 to 30 years. Lopez argued that this possibility violated the Illinois Constitution's requirement that "[a]ll penalties *** be determined *** according to the seriousness of the offense." Ill. Const. 1970, art. I, § 11. *Lopez*, 166 Ill. 2d 441.

¶ 61 However, the majority rejected the challenge finding the disparity in sentencing not to be cruel, degrading or so wholly disproportionate as to shock the moral sense of the community and therefore did not violate due process, despite Justice McMorrow's separate opinion. *Lopez*, 166 Ill. 2d at 452 (McMorrow, J., concurring in part and dissenting in part, joined by

- 11 -

Bilandic, C.J.) (quoting Timothy P. O'Neill, *"With Malice Toward None": A Solution to an Illinois Homicide Quandary*, 32 DePaul L. Rev. 107, 107-08 (1982)). The *Lopez* court suggested that any changes to the status of attempted second degree murder in Illinois would have to originate with the legislature. *Id.* at 450. As previously discussed, in the almost 20 years since *Lopez*, the legislature has not made any amendments to the attempted murder statute to allow a defendant to mitigate the crime based on an unreasonable belief in the need for self-defense, despite the fact that the legislature amended section 8-4(c)(1)(E) in 2010 allowing for defendants convicted of attempted murder to prove at sentencing, by preponderance of the evidence, that the mitigating factor of provocation was present, so as to reduce the class of offense from a Class X offense to a Class 1 offense. 720 ILCS 5/8-4(c)(1)(E) (West 2010). The legislature's inaction suggests agreement with the judicial interpretation of *Lopez*. *In re May 1991 Will County Grand Jury*, 152 Ill. 2d at 388; *Agnew*, 105 Ill. 2d at 280.

¶ 62    In accordance with *Morgan*, *Sharpe* and *Lopez*, we hold that the alleged disparity in sentencing range between defendant's sentence for attempted first degree murder and second degree murder is not cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community and therefore does not violate due process.

¶ 63    Defendant next claims that his sentence for attempted murder violates equal protection by imposing a harsher sentence than defendant would have received had he killed Flores.

¶ 64    Equal protection requires that similarly situated individuals will be treated in a similar manner. *People v. Reed*, 148 Ill. 2d 1, 7 (1992). The equal protection clauses of the United States and Illinois Constitutions do not deny the State the power to draw lines that treat different classes of people differently, but prohibits the State from according unequal treatment to persons placed by a statute into different classes for reasons wholly unrelated to the purpose of the legislation. *People v. Shephard*, 152 Ill. 2d 489, 499 (1992). To state a cause of action for a violation of equal protection, a plaintiff must allege that there are other people similarly situated to him, that these people are treated differently than him, and that there is no rational basis for this differentiation. See *Safanda v. Zoning Board of Appeals*, 203 Ill. App. 3d 687, 695 (1990); accord *Kaczka v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 398 Ill. App. 3d 702, 707-08 (2010). A court uses the same analysis in assessing equal protection claims under both the state and federal constitutions. *Reed*, 148 Ill. 2d at 7.

¶ 65    The legislative classification at issue determines the level of scrutiny to be applied when analyzing legislation under equal protection. Classifications based on race or national origin or affecting fundamental rights are strictly scrutinized. *McLean v. Department of Revenue*, 184 Ill. 2d 341, 354 (1998). When the legislative classification does not implicate a suspect classification or a fundamental right, rational basis review is employed. *Shephard*, 152 Ill. 2d at 500. Under the rational basis test, the challenged statute must bear a rational relationship to the purpose the legislature intended to achieve by enacting it. *Id*.

¶ 66    Defendant is not a member of a suspect class. "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). Accordingly, we employ the rational basis test.

¶ 67    Under the rational basis test, a statutory classification need only bear a rational relationship to a legitimate state goal. *Reed*, 148 Ill. 2d at 7-8. More specifically, we are charged with

determining, " 'whether the statute is reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety and general welfare.' " *People v. Bradley*, 79 Ill. 2d 410, 417 (1980) (quoting *Heimgaertner v. Benjamin Electric Manufacturing Co.*, 6 Ill. 2d 152, 159 (1955)). Only if the statute withstands this test can it be upheld. *Reed*, 148 Ill. 2d at 7-8.

¶ 68    However, before we can reach the ultimate question of whether the complained of statute violates the equal protection clause, we must first determine whether respondent is similarly situated to the comparison group. *People v. Whitfield*, 228 Ill. 2d 502, 513 (2007). When a party fails to make this showing, his equal protection challenge must fail. *Id*.

¶ 69    Without explanation other than to say that "a defendant who shoots and kills a person with intent to kill and an unreasonable belief in self-defense receives a far less harsh sentence than one who fails to kill," defendant argues that principles of equal protection were violated. We agree with the State that defendant has failed to indentify a suspect class or identify others convicted of attempted first degree murder that have been treated unequally under the law. Therefore, defendant has not established that his sentence for attempted first degree murder was disproportionate to the offense or that his guarantee of equal protection was violated.

¶ 70                         V. Deterring the Use of Firearms

¶ 71    Defendant next argues that his sentence for attempted first degree murder is unconstitutional because the firearm add-on imposed is not reasonably related to the aim of deterring firearm use and thus violates due process. In support of his argument defendant cites *People v. Alejos*, 97 Ill. 2d 502 (1983).

¶ 72    We begin by noting that defendant did not raise this specific challenge to the constitutionality of the firearm add-on statute in the trial court or in his posttrial motion, but a challenge to the constitutionality of a statute can be raised at any time. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 23.

¶ 73    In *Alejos*, the defendant was convicted of voluntary manslaughter and armed violence based on voluntary manslaughter and argued that armed violence could not be predicated on voluntary manslaughter. At the time of the offenses, the armed violence statute made it a Class X felony to commit any felony under Illinois law while armed with a dangerous weapon such as a handgun, knife or bludgeon. See Ill. Rev. Stat. 1979, ch. 38, ¶ 33A-1 *et seq*.

¶ 74    The court found that the "stiff punishment mandated by the armed-violence provision [was] intended not only to punish the criminal and protect society from him but also to deter his conduct–that of carrying the weapon while committing a felony." *Alejos*, 97 Ill. 2d at 509. With that in mind, the court found that because voluntary manslaughter was not a premeditated crime but was committed "on the spur of the moment," it was not likely to be deterred by the armed violence provisions punishing those offenses more severely. Therefore, armed violence could not be predicated on voluntary manslaughter. *Id*.

¶ 75    Defendant attempts to use the framework of *Alejos* to support his claim here. Defendant maintains that the analysis in *Alejos* is dispositive in this case because both the attempted murder of Flores and the killing in *Alejos* were accompanied by a mitigating fact. Defendant urges:

    "The purpose of the armed violence statute and the firearm add-ons are the same, to deter the usage of firearms in certain named felonies. [Citations omitted]. There is thus

- 13 -

no daylight between the analysis in *Alejos* and the one in this case. The add-on could not logically deter the use of a firearm in an attempted killing done with an unreasonable belief in self-defense, as it does not in second degree murder."

¶ 76    As previously discussed, the legislature enacted Public Act 91-404 for the purpose of deterring the use of firearms in the commission of a felony offense. Pub. Act 91-404, § 5 (eff. Jan. 1, 2000) (adding 720 ILCS 5/33A-1(b)(1)). In an effort to deter the use of firearms during the commission of a felony offense, the legislature increased the penalties for certain offenses when the offender is armed with a dangerous weapon other than a firearm, possesses a firearm, discharges a firearm, and discharges a firearm that causes great bodily harm, permanent disability, disfigurement or death. *Moss*, 206 Ill. 2d at 506.

¶ 77    Contrary to defendant's argument, we find sufficient "daylight" between the analysis in *Alejos* and the facts in this case to find the 20-year add-on in this case reasonably related to the evil targeted by the legislature. After *Alejos*, the legislature in 1986 replaced the offense of voluntary manslaughter with the offense of second degree murder where either provocation or imperfect self-dense is established. *People v. Shumpert*, 126 Ill. 2d 344, 348 (1989). In enacting the second degree murder statute the legislature addressed the elements of the offense and did not deal with the sentencing enhancements. The legislature has determined that the sentencing add-on mandated under section 33A-1(b)(1) applies in certain instances where firearms are involved without consideration of whether mitigating factors of provocation or imperfect self-defense exist. Defendant has advanced no compelling reason within a due process framework that convinces this court that an unconstitutional sentence has been imposed in this case. Unlike the voluntary manslaughter in *Alejos*, defendant's attempted murder of Flores cannot be mitigated by consideration of defendant's second degree murder conviction to avoid the mandatory sentence enhancement imposed by the trial court.

¶ 78                              VI. Excessive Sentence

¶ 79    Defendant contends that his 18-year sentence for second degree murder and 36-year sentence for attempted murder are excessive given his great potential for rehabilitation and other mitigating factors.

¶ 80    A trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive. *People v. Jones*, 168 Ill. 2d 367, 373 (1995). A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case and depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). "In determining an appropriate sentence, the defendant's history, character, rehabilitative potential, the seriousness of the offense, the need to protect society and the need for deterrence and punishment must be equally weighed." *People v. Jones*, 295 Ill. App. 3d 444, 455 (1998). There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and the court is presumed to have considered any evidence in mitigation that is before it. *People v. Partin*, 156 Ill. App. 3d 365, 373 (1987). The imposition of a sentence is a matter within the trial court's discretion, and a reviewing court has the power to disturb the sentence only if the trial court abused its discretion. *Jones*, 168 Ill. 2d at 373-74.

¶ 81    We find no abuse of discretion in this case. At sentencing, the court was advised that defendant, who is a high school graduate, was working at the time of his arrest and was close

with his family. The presentence investigation report (PSI) stated that defendant had one misdemeanor and three drug-related felony convictions in his background. In allocution, defendant apologized to Saldivar's family, repeating that he never intended to hurt anyone and he was afraid that the victims were going to come back and harm him. In imposing sentence, the court indicated that it had considered the arguments of counsel, the PSI, the evidence offered in aggravation and mitigation and the statutory factors in aggravation and mitigation. See 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2008). Based on the record, the court clearly considered defendant's potential for rehabilitation, and other mitigating factors. Furthermore, defendant's sentences fell within the statutory range and are therefore presumptively proper. *People v. Hauschild*, 226 Ill. 2d 63, 90 (2007); see 720 ILCS 5/8-4(c)(1) (West 2006); 730 ILCS 5/5-8-1(a)(3) (West 2006); 720 ILCS 5/8-4(a)(1)(C) (West 2006); 730 ILCS 5/5-8-1(a)(1.5) (West 2006). Consequently, we cannot say the trial court abused its discretion in imposing the aggregate 54-year sentence.

¶ 82                              VII. Ineffective Assistance of Counsel

¶ 83        Defendant claims that counsel was ineffective for not seeking to have his sentence for attempted first degree murder reduced based on provocation. Defendant argues that at the time of sentencing, section 8-4(c)(1)(E) allowed for defendants convicted of attempted murder to prove, by preponderance of the evidence, that the mitigating factor of provocation was present, so as to reduce the class of offense from a Class X offense to a Class 1 offense. 720 ILCS 5/8-4(c)(1)(E) (West 2010). Defendant faults counsel for not invoking this statute where there was a "substantial physical assault" which preceded the shooting.

¶ 84        In a criminal case a defendant is constitutionally guaranteed effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668 (1984); adopted by *People v. Albanese*, 104 Ill. 2d 504 (1984). A defendant must meet a two-prong test to prevail on an ineffective assistance claim: (1) counsel's performance fell below an objective standard of reasonableness; and (2) there is reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Strickland*, 466 U.S. at 687.

¶ 85        Under the first prong of the *Strickland* test, defendant must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, defendant must overcome the presumption that under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A defendant satisfies the second prong of *Strickland* if he can show that a reasonable probability exists that, had counsel not erred, the trier of fact would not have found him guilty beyond a reasonable doubt. *People v. Caballero*, 126 Ill. 2d 248, 260 (1989). Where the defendant fails to prove prejudice, the reviewing court need not determine whether counsel's performance constituted less than reasonable assistance. *Strickland*, 466 U.S. at 697, 699; *People v. Flores*, 153 Ill. 2d 264, 283-84 (1992).

¶ 86        The burden is on the defendant to overcome the strong presumption that defense counsel rendered adequate assistance using reasonable professional judgment pursuant to sound trial strategy. *Strickland*, 466 U.S. at 689-90. It is not enough that trial counsel failed to meet the competence standard; defendant must also show that he was prejudiced as a result. *Id*. at 692-93.

¶ 87    The statute in question here, which became effective January 1, 2010, reads that in a prosecution for attempted first degree murder:

> "[I]f the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for attempted murder is the sentence for a Class 1 felony." 720 ILCS 5/8-4(c)(1)(E) (West 2010).

¶ 88    A plain reading of the statute establishes that a reduction in sentence is available in prosecutions for attempted murder only if the defendant "was acting under a sudden and intense passion resulting from serious provocation." Whether provocation existed was not at issue in this case. Indeed, the trial court found that the evidence did not support defendant's proposed jury instruction on provocation, an issue that defendant does not raise before this court. Defendant's theory of the case was that he acted in self-defense and argued as such throughout all stages of the proceedings. The statute does not provide for a reduction in sentence when a defendant proves by a preponderance of the evidence that he is acting in self-defense. Where no provocation occurred in this case, section 8-4(c)(1)(E) was not applicable and therefore defendant was not prejudiced by counsel's failure to request the reduction at sentencing.

¶ 89                              CONCLUSION

¶ 90    For the foregoing reasons, we vacate defendant's conviction for aggravated discharge of a firearm and affirm defendant's remaining convictions.

¶ 91    Affirmed in part and vacated in part.