2021 IL App (1st) 180653-U

No. 1-18-0653

Order filed May 17, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 4853 |
| | ) | |
| LAVONTE MOORE, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Walker and Justice Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's convictions for second degree murder and aggravated battery with a firearm are affirmed where the record supported a finding that defendant's belief in the need to use deadly force was unreasonable, and defendant's intent to shoot the murder victim transferred to the aggravated battery victim.

¶ 2    Following a bench trial, defendant Lavonte Moore was found guilty of the second degree murder of Henry Taylor (720 ILCS 5/9-2 (West 2010)) and aggravated battery with a firearm of

Denzel Hurd (720 ILCS 5/12-4.2 (West 2010)).[1] He appeals, arguing that the evidence at trial was insufficient to refute his affirmative defense of self-defense or defense of another, or establish his intent to commit aggravated battery with a firearm. We affirm.

¶ 3     Defendant was charged with the offenses of first degree murder of Henry, felony murder of Henry, attempt murder of Hurd, and aggravated battery with a firearm of Hurd. Defendant asserted the affirmative defense of self-defense or defense of another.

¶ 4     The matter proceeded to a bench trial, at which Thelma Taylor, Henry's mother, testified that on May 20, 2011, Carmen Russell, Henry's girlfriend, called and told her that Henry had been shot. He later died at Stroger Hospital. Russell told Thelma that "L.L." shot Henry, information Thelma relayed to Chicago police detective Adrian Garcia at Stroger Hospital, and again at the police station.

¶ 5     Russell testified that she knew defendant by the nickname L.L. "[t]hrough the neighborhood." On May 20, 2011, Russell and Henry were driving near the intersection of South Cicero Avenue and West Van Buren Street in Chicago when Henry saw "a young boy that owed him some money," later identified as Hurd. Henry stopped and exited the vehicle while Russell remained inside. He began choking Hurd. During the ensuing "fistfight," Russell heard a loud sound, looked to her right, and saw defendant approach with a "small, black gun," and fire five or six shots towards Henry and Hurd. She never saw Henry or Hurd in possession of a gun. After the gunfire stopped, Henry told Russell he had been shot and she drove him to Loretto Hospital.

---

[1] Because Henry Taylor and a witness, Thelma Taylor, have the same last name, we will refer to them by their first names.

¶ 6     A few days later, Russell looked at a photo array at the police station and identified defendant as the person who shot Henry. Russell also gave a written statement to the police indicating that Henry was a heroin dealer, the area in which the shooting occurred was his drug block, and someone else was trying to sell drugs on the block. She confirmed that Henry was approximately 6'2'' tall.

¶ 7     Hurd testified that he was selling heroin on the corner of Cicero and Van Buren in Chicago, when a man he did not know approached "waving a gun" and told him someone would "get you all killed." The man drove away, but "came back around and tried hitting [him] with a car." The man got out of the car and grabbed Hurd by the throat and his pocket. As they were "tussling," Hurd fell to the ground, hearing a gunshot as he fell and his head hit a gate. While on the ground, he heard more gunshots, and people "screamed, told me I was shot." Hurd believed he heard five total gunshots. He assumed "the person that was tussling with [him]" shot him. Hurd spoke to the police at Loretto Hospital, but denied being asked who shot him or telling police that someone approached while he and Henry were fighting and shot at both of them.

¶ 8     Hurd admitted to later telling police he had been on the block selling heroin, but denied saying that he was selling drugs for defendant. He also denied saying that defendant approached him and Henry with something in his hand or that he saw muzzle flashes coming from a gun in defendant's hand. Hurd acknowledged that he provided a written statement to a woman at the police station, but denied that she identified herself as an Assistant's State Attorney (ASA). He also denied telling her that he had been selling drugs for defendant for a couple of weeks prior to the incident, that he saw a flash from defendant's hand during the shooting, or that he and the guy he was tussling with did not have weapons.

¶ 9     Hurd denied testifying before a grand jury that he was selling drugs for defendant prior to the shooting, that Henry did not have any weapons, or that defendant shot Henry. Hurd also denied testifying that he told the nurses at the hospital that "the man that attacked [him]" shot him because he was "afraid" of defendant or that he told Detective Garcia that defendant shot him. He claimed that he identified defendant as the shooter because detectives "threatened to charge [him]" and that he never discussed his grand jury testimony with defendant. Hurd is 5'6'' tall and weighed 135 pounds at the time of the shooting. Hurd testified at trial that Henry waved a gun at him and tried to hit him with his vehicle, choked him, slammed him into a fence, and shot him.

¶ 10     Darnell Junious testified that he was currently incarcerated on pending charges of firearm possession, aggravated kidnapping, and resisting arrest. He was with Hurd when Henry approached and "started choking [Hurd] and going in his pockets." Henry and Hurd were "tussling" for a matter of "seconds" when Junious heard gunshots. As Hurd fled, Henry ran to a vehicle. Junious testified at trial that he was not sure if Henry had a gun when he first approached Hurd, but was impeached by his grand jury testimony that he "[d]id [not] see Henry with a gun."

¶ 11     Officer Garcia testified that he spoke to Russell and Hurd following the incident. Hurd identified defendant as the shooter orally and in writing. No one threatened Hurd with anything in exchange for his statements. After defendant was identified by Russell and Hurd as the shooter, Garcia coordinated with the FBI to effectuate defendant's arrest in Greenville, South Carolina.

¶ 12     Defendant testified that on the day of the incident he saw Henry nearly hit Hurd with his car. Henry exited his car and started "walking up towards [Hurd]***holding his waist like he had a gun." Defendant thought Henry was "about to kill [Hurd]." Henry "pulled out [a] gun and shot

[Hurd]." After Henry shot Hurd, he "turned towards" defendant. That is when defendant "pulled out [his] gun" and fired at Henry. He fired because he thought Henry "was about to shoot [him]."

¶ 13   Less than 10 seconds passed between the time defendant saw Henry draw his gun and the time defendant discharged his own gun. Defendant fired in an "[i]nstant" after he saw Henry turn towards him, but did not recall how many times he fired at Henry. Defendant ran away and did not remember what he did with the gun.

¶ 14   The parties stipulated to the testimony of Chicago police detective J. Swinkle, that Russell told him she dropped off Henry, drove around the block, and returned to find him on the ground. The parties also stipulated to the testimony of Crystal Carey, a nurse at Loretto Hospital, who was treating Hurd for a gunshot wound to the wrist when Henry walked into the emergency room. Hurd pointed to Henry and said, "that's the man who shot me" and Henry "held his hand up towards [Hurd] like a gun."

¶ 15   During his closing argument, defense counsel was asked by the court to address the "amount of force" used by defendant, contrasting defendant's conduct with hypothetical scenarios in which defendant fired a warning shot or "shot one time to get them to stop fighting or to get Henry to let him go." The court also asked whether, assuming Henry did not have a gun, "what [defendant] did after he fired the first shot was unreasonable," as he could have "fire[d] one shot in the air or if necessary fire one shot towards Henry Taylor but not five or six." Counsel responded that "even then when it comes down to self-defense it is impossible to ask somebody to turn on and off fear. It is impossible to turn off immediately your belief that this person is killing the other person."

¶ 16    Defendant was convicted of second degree murder of Henry and aggravated battery with a firearm of Hurd. The court found that Henry saw Hurd selling drugs at "his drug spot," drove his vehicle onto the curb towards Hurd, exited his vehicle, and started choking Hurd and banging Hurd's head on a nearby structure. Defendant "saw what was going on***and he fired several shots injuring both" Hurd and Henry. The court ruled that Henry was the initial aggressor and that defendant established the first five elements of self-defense because of the danger Henry posed to Hurd, but that "it was unreasonable for the defendant to shoot as many shots as he fired" because Henry was not using a deadly weapon against Hurd.

¶ 17    In denying defendant's motion for a new trial, the judge clarified that "[she] did not find that Henry Taylor had a gun." The judge explained that the offense of aggravated battery with a firearm did not require the State to prove "an element of intent to shoot the person harmed by the firearm," only "an intent to shoot." Defendant was sentenced to 20 years' imprisonment for second degree murder and a consecutive 6-year term for aggravated battery with a firearm.

¶ 18    On appeal, defendant first argues that the evidence was insufficient to refute his affirmative defense of self-defense or defense of another with respect to his second degree murder conviction.

¶ 19    When reviewing the sufficiency of the evidence, the reviewing court construes all the evidence in the light most favorable to the State and determines whether any rational factfinder could have found the defendant guilty beyond a reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. All reasonable inferences are drawn in favor of the State. *People v. Hardman*, 2017 IL 121453, ¶ 37. Additionally, the reviewing court will not substitute its judgment for that of the factfinder regarding the weight of the evidence or the credibility of witnesses. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). A reversal is not warranted unless the evidence is so unreasonable,

improbable, or unsatisfactory that it gives rise to a reasonable doubt of the defendant's guilt. *Newton*, 2018 IL 122958, ¶ 24.

¶ 20    Defendant was charged with first degree murder, which required the State to prove that defendant, without justification, intentionally or knowingly killed Henry with a firearm, and that defendant's discharge of the firearm proximately caused Henry's death. 720 ILCS 5/9-1(a)(1) (West 2010).

¶ 21    To establish self-defense, a defendant must show that he was "justified in the use of force against another" because he reasonably believed "such conduct [was] necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1 (West 2010). The defendant must present evidence respecting six elements to establish the defense:

> "(1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995).

If the State negates any one element, the affirmative defense fails. *Id.* at 128.

¶ 22    To support a conviction for the charge of second degree murder, the State must first establish the defendant's guilt of first degree murder, at which point the burden shifts to the defendant to establish that a statutory mitigating factor exists by a preponderance of the evidence. *People v. Guyton*, 2014 IL App (1st) 110450, ¶ 37. One such mitigating factor is "imperfect self-defense," where the factfinder concludes that the defendant established the first five elements of self-defense, but his beliefs were objectively unreasonable. *People v. Castellano*, 2015 IL App

(1st) 133874, ¶ 148. Whether the evidence supports a conclusion that a defendant is guilty of first or second degree murder, or not guilty based on self-defense, is a factual determination for the trier of fact. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52.

¶ 23    The evidence establishes that Henry exited his vehicle, approached Hurd, and began choking and fighting with him. The trial court found that while Henry was banging Hurd's head against a structure, defendant approached and discharged his weapon, shooting both Henry and Hurd. Although defendant testified that the time between Henry firing his gun and defendant returning fire was less than ten seconds, there is no evidence regarding the length of time that elapsed between the additional shots fired by defendant.

¶ 24    There is conflicting testimony regarding whether Henry had a gun. Russell testified he had no gun, Hurd saw Henry reach towards his waistline but never saw a gun, Junious testified at trial that he did not know whether Henry had a gun, but was impeached by his grand jury testimony that he never saw Henry with a gun. Defendant testified Henry had a gun and shot Hurd first, then turned towards him, at which time he fired at Henry. The court "did not find that Henry Taylor had a gun."

¶ 25    The court held that defendant established the first five elements of acting in defense of Hurd, but "it was unreasonable for defendant to shoot as many shots as he fired." Defendant's unreasonable belief that multiple shots were necessary justified a finding of second degree murder based on imperfect self-defense.

¶ 26    Defendant argues that the trial court raised the possibility that defendant acted reasonably when he fired the first shot. Therefore, the court should not have found that the additional shots constituted unreasonable conduct without evidence of the amount of time that elapsed between the

shots for circumstances to change. See *In re S.M.,* 93 Ill. App. 3d 105, 110-11 (1981) (the defendant was reasonable in firing multiple shots where, following the initial shot, "[t]here was nothing to indicate that the danger to [the defendant] ended"); *People v. Bailey*, 27 Ill. App. 3d 128, 135-36 (1975) (the defendant was reasonable in firing multiple shots where "there was no evidence which established a reasonable interval *** which would have allowed the defendant to realize he was no longer in danger"). Initially, the trial court never expressly held that defendant acted reasonably in firing one shot. Moreover, when considering the sufficiency of the evidence, the reviewing court will only reverse the lower court's decision where the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt remains as to the defendant's guilt. *Newton*, 2018 IL 122958, ¶ 24. The record does not support such a finding.

¶ 27       All reasonable inferences from the evidence must be drawn in favor of the State. *Hardman*, 2017 IL 121453, ¶ 37. Based on evidence that Henry and Hurd were struggling but Henry did not use a weapon, it was reasonable for the factfinder to conclude that defendant was justified in using some force to defend Hurd, but not deadly force, even though Henry was physically larger than Hurd. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 61 ("To shoot someone in response to a punch is not reasonable self-defense or defense of others justifying such use of deadly force."). Therefore, the record supports the trial court's conclusion that the use of deadly force was unreasonable.

¶ 28       Defendant next argues that that the evidence was insufficient to sustain his conviction for aggravated battery with a firearm because he lacked the specific intent to shoot Hurd.

¶ 29       The parties dispute the standard of review; defendant claims *de novo* review applies because the relevant facts are undisputed, whereas the State urges review based on the sufficiency

of evidence. Since whether defendant acted in self-defense is a disputed factual issue, sufficiency of the evidence review is appropriate. See *People v. Calloway*, 2019 IL App (1st) 160983, ¶ 33 (applying sufficiency of the evidence review over the defendant's argument that *de novo* review applied where the question presented was "a disputed factual question").

¶ 30     To establish aggravated battery with a firearm, the State must prove that while "committing a battery, [the defendant] knowingly or intentionally by means of discharging a firearm" caused injury to Hurd. 720 ILCS 5/12-4.2(a)(1) (West 2010).

¶ 31     Defendant argues that because this is a specific intent crime, the State had to prove "not only that [defendant] fired his weapon intentionally, but that he intentionally or knowingly caused harm to Hurd." The State responds that defendant's argument is inapposite because the doctrine of transferred intent applies.

¶ 32     The doctrine of transferred intent "applies when a third person is injured as a result of a defendant's assault upon another person." *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 83 (citing *People v. Ephraim*, 232 Ill. App. 3d 1097, 1109 (2001)). "If the defendant acted in provocation or unreasonable self-defense in shooting at the intended target, he acted the same way with respect to [an] innocent bystander" whom he kills instead *People v. O'Neal*, 2016 IL App (1st) 132284, ¶ 59. "[T]he determination of whether a defendant *** possessed an actual, although unreasonable belief in the need for self-defense is irrelevant for purposes of determining whether an aggravated battery has occurred." *People v. Young*, 316 Ill. App. 3d 963, 967 (2000).

¶ 33     Defendant, relying on *People v. Peterson*, 273 Ill. App. 3d 413 (1995), argues that "[t]he doctrine of transferred intent is [] inapplicable because it is clear that [defendant] did not intend to hurt Hurd." In *Peterson*, transferred intent did not apply because the court "[could not] ascertain

which defendant committed the unintended wrong." *Id.* at 421. Whereas, here, it is undisputed that defendant shot both Henry and Hurd and that defendant intended to shoot Henry with deadly force. Defendant's intent to shoot and kill Henry without legal justification "transferred" to Hurd, who was the unintended victim "injured as a result of defendant's assault upon [Henry]." See *Hensley*, 2014 IL App (1st) 120802, ¶ 83; *O'Neal*, 2016 IL App (1st) 132284, ¶ 59. Additionally, as previously discussed, because defendant must satisfy all six elements of self-defense in the context of an aggravated battery with a firearm, defendant's affirmative defense fails. See *Jeffries*, 164 Ill. 2d at 128; see also *Young*, 316 Ill. App. 3d at 967. It follows that the evidence was sufficient to sustain the court's finding of guilt on aggravated battery with a firearm.

¶ 34    For the foregoing reasons, defendant's convictions are affirmed.

¶ 35    Affirmed.