2022 IL App (2d) 200119-U
No. 2-20-0119
Order filed January 18, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-462 |
| CARL R. RUSSELL, | ) ) ) | Honorable Philip G. Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) Trial counsel was not ineffective for failing to request an instruction on the unreasonable belief in self-defense concerning attempt (first-degree murder) charges; (2) the trial court did not abuse its discretion when it refused to instruct the jury on use of force in defense of a dwelling; and (3) defendant's 45-year sentence for attempt (first-degree murder) was not excessive.

¶ 2   Following a jury trial in the circuit court of De Kalb County, defendant, Carl R. Russell,

was convicted of four counts of attempt (first-degree murder) (720 ILCS 5/8-4, 9-1 (West 2016)),

one count of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)), one count

of aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2016)), and one count of aggravated

discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)). Pursuant to the one-act, one-crime rule, the court merged all of defendant's convictions into one conviction of attempt (first-degree murder). The trial court then sentenced defendant to a term of 45 years' imprisonment, which sentence included a mandatory 25-year firearm enhancement. Defendant appeals, raising three distinct issues. First, defendant argues that he was denied the effective assistance of counsel where counsel failed to request an instruction on the unreasonable belief in self-defense concerning the attempt (first-degree murder) charges. Second, defendant argues that the trial court abused its discretion when it refused to instruct the jury on the use of force in defense of a dwelling. Third, defendant argues that the sentence imposed by the trial court was excessive. We disagree with all three contentions. Consequently, we affirm defendant's convictions and sentence.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant's convictions stem from an incident occurring in Sandwich, Illinois, in the early morning hours of July 2, 2017, during which Eric Peterson was shot. A bullet pierced the upper right side of Peterson's head, travelled through his brain, and exited the back of his skull. As a result of the shooting, Peterson lost his right eye and half of his skull. In addition, Peterson is paralyzed on the left side of his body, is bound to a wheelchair, has cognitive deficits and short-term memory problems, suffers from diabetes insipidus, is prone to seizures, and requires continuous care. Defendant was initially charged by information with various offenses related to the shooting. On July 21, 2017, a grand jury returned an indictment against defendant, charging him with four counts of attempt (first-degree murder) (720 ILCS 5/8-4, 9-1 (West 2016)), one count of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)), one count of aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2016)), and one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)).

¶ 5                                    A. Trial Proceedings

¶ 6     Prior to trial, defendant filed a notice of intent to rely upon the affirmative defense of justifiable use of force in defense of a person pursuant to section 7-1(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/7-1(a) (West 2016)) and a notice of intent to rely upon the affirmative defense of justifiable use of force in defense of a dwelling pursuant to sections 7-2(a)(1) and 7-2(a)(2) of the Code (720 ILCS 5/7-2(a)(1), (a)(2) (West 2016)). The matter proceeded to a jury trial beginning on June 17, 2019. The following evidence was adduced at defendant's trial.

¶ 7     Defendant resided in a four-plex on Lillian Lane in Sandwich. Defendant's unit shared a common wall with a unit in which Dallas Schroeder and Emma Belmore resided with their infant son. Schroeder testified that he and Belmore moved to their unit late in June 2017. On July 1, 2017, Peterson and Lorena Melendez, Peterson's girlfriend, were at Schroeder's and Belmore's home to help them finish moving in. Peterson and Melendez also had a baby and brought her with them that day. The group finished the move at approximately 3 p.m.

¶ 8     Between 4 and 5 p.m., Schroeder went outside to smoke and met defendant for the first time. Schroeder introduced himself to defendant, and the two visited in Schroeder's garage before Peterson came out and joined them. Schroeder, Peterson, and defendant hung out in Schroeder's garage and drank together for a while. At one point, Schroeder and defendant gave a tour of their respective homes to each other while Peterson accompanied them. While the three men were in defendant's home, defendant showed Schroeder and Peterson his guns, which included a shotgun, an AR rifle, an AK rifle, and a sniper rifle. Schroeder testified that he did not own any guns. At around 9 p.m., the three men returned to Schroeder's garage to hang out some more and drink. There had been no issues or arguments up to this point.

¶ 9      Later in the evening, Schroeder was chatting with another neighbor when Belmore summoned him and reported that defendant had been "flirtatious." In response, Schroeder asked defendant to leave the garage so that he, Belmore, Melendez, and Peterson could go inside and call it a night. Schroeder testified that he had to calm defendant down because defendant did not want to leave. Defendant insisted that everything was fine and that nothing was going on. Defendant eventually left, after which Schroeder shut his garage door. Schroeder, Belmore, Melendez, and Peterson then went inside. Schroeder, Belmore, and Melendez later returned to the garage to smoke. Shortly thereafter, defendant began banging on Schroeder's garage door, saying everything was fine and that he just wanted to have a beer. Defendant tried to get Schroeder and the women to come outside, but the group ignored him.

¶ 10      After the group went back inside, defendant continued to bang on Schroeder's garage door. Schroeder testified that he did not want to call the police on a neighbor that he had just met, so he called his cousin, Jared Imel. Imel, accompanied by Ian Millz, drove to Schroeder's house in one car and arrived shortly after midnight on July 2, 2017. When Imel and Millz arrived, Schroeder opened his garage door and went out to his driveway to meet them. Peterson followed Schroeder out of his garage and walked towards defendant's unit. Defendant's garage door was open, and defendant was standing on the "inside edge" of the garage. The only cars parked in Schroeder's driveway were his car and Belmore's car, which were parked side by side just outside Schroeder's garage door, and the car driven by Imel, which was parked behind Schroeder's car. Schroeder stated that it was not unusual in the neighborhood to see numerous vehicles in people's driveways.

¶ 11      As Schroeder spoke with Imel and Millz by their car, he observed Peterson talking to defendant at his open garage door. Schroeder estimated that Peterson was about 5'9" tall and weighed about 120 pounds. Peterson and defendant were about two feet from each other.

Schroeder could not hear what Peterson and defendant were talking about. Further, neither Schroeder, Imel, Millz, or Peterson had a gun or any other type of weapon, and Schroeder did not hear anyone threaten defendant or see anyone walk or rush towards defendant. As Schroeder spoke to Imel and Millz, he heard a gunshot. Schroeder looked over and saw defendant with a gun in his hand pointed towards the ground and Peterson lying on the ground, three or four feet away from defendant. Schroeder did not hear defendant yell a warning prior to the gunshot. After Schroeder heard the gunshot, he, Imel, and Millz ran inside. Belmore, who was in Schroeder's garage, also ran inside. Once inside, the group contacted the police. The police arrived less than five minutes later. Schroeder testified that while he was outside talking to Imel and Millz, no other cars pulled up and no other persons arrived. Further, Schroeder testified that neither he nor anyone else threatened defendant in any way that day.

¶ 12    Melendez, Peterson's girlfriend at the time and the mother of their child, was 20 years of age in July 2017. Melendez testified that prior to the shooting, Peterson had limited mobility of his right arm due to an injury the year before that required plates in his elbow.

¶ 13    Regarding the events leading to the shooting, Melendez testified that on the morning of July 1, 2017, Belmore picked up her and her six-month-old child so that she could help Belmore and Schroeder move into their new home. Schroeder picked up Peterson later in the day. The group spent the day unpacking, visiting, and going in and out of the house and garage. Schroeder and Peterson drank alcohol at various points that day, and Melendez occasionally joined them in the garage to smoke cigarettes and marijuana. Melendez stated that she had her first drink later in the evening, about 45 minutes prior to the shooting, but only had about five sips of alcohol. Melendez claimed that she was not high or intoxicated on the night of the shooting.

¶ 14    Melendez testified that Schroeder and Peterson socialized with defendant throughout the day and the three men seemed to be getting along. Melendez recalled the men going into defendant's house at one point. Melendez testified that when she met defendant, he said some things that made her uncomfortable. Defendant told Melendez how good looking she was and how Mexican women were "his thing." Melendez stated that defendant's inappropriate conduct became progressively worse as the evening went on. Peterson was present for some of defendant's conduct and did nothing. Melendez testified that she was very angry at Peterson for not sticking up for her and not saying anything to defendant.

¶ 15    Melendez testified that defendant's offensive conduct reached a peak about 30 or 40 minutes before the shooting. At that time, Melendez and Belmore were sitting on the hood of Belmore's car. Defendant approached and touched Belmore's shoulder and chest and then brushed his hand against Melendez's knee. As defendant got closer, he told Melendez she was beautiful. Peterson then came out of Schroeder's house and went into the garage. At that point, defendant walked into the garage and told Peterson, "[Y]ou don't know the nasty things that I would do to her if you weren't here." Peterson laughed off the comment, which made Melendez angry. Melendez yelled at Peterson for not sticking up for her and told defendant that he was "gross" because of their 20-year age difference. Melendez stated that she was also upset that defendant was hitting on her in front of her boyfriend and that Peterson did not confront defendant about it. Shortly later, Melendez, Belmore, Schroeder, and Peterson went inside and closed the garage door. Afterwards, defendant returned and started banging on the garage door, wanting to talk. The group ignored defendant. Schroeder then called Imel and Millz to come to the house.

¶ 16    When Imel and Millz arrived, Schroeder and Belmore walked out the front door to greet them. Peterson then opened the garage door and walked out. Melendez followed Peterson into the

garage holding their baby, but she did not walk past the middle of the garage, so she did not see where Peterson went. Soon after Melendez stepped into Schroeder's garage, she heard a gunshot. Melendez estimated that the gunshot occurred within 10 seconds after Peterson left Schroeder's garage. After the gunshot, one of the men grabbed Melendez by the arm and ushered her and the baby back into the house. Both Belmore and either Imel or Millz called 9-1-1. Melendez testified that no one in her group was armed and none of them ever threatened defendant at any point that day.

¶ 17    On cross-examination, Melendez testified that she gave a statement to the police shortly after the shooting. In her statement, she told the police that Schroeder called Imel and Millz because defendant was "threatening to call up his boys." Melendez stated that this information was related to her by Belmore. However, prior to the shooting, Melendez was not personally aware of any threats made by defendant towards Peterson or Schroeder.

¶ 18    Belmore corroborated the testimony of the other witnesses about the beginning of the day. Belmore further recounted that after she and Melendez got their babies to sleep, they went outside and sat on the hood of her car while Schroeder went to talk to one of the other neighbors. Peterson was standing inside Schroeder's garage, and defendant was standing in front of Belmore and Melendez. At one point, defendant got very close to Belmore, which made her feel uncomfortable. Defendant also said some "disrespectful things," most of which were directed at Melendez. For instance, defendant told Melendez that if Peterson were not around, he would "do dirty things to her." Belmore stated that defendant's comments made Melendez very angry. Melendez yelled at both defendant and Peterson, who was present when defendant made some of the remarks. Belmore summoned Schroeder and informed him what was going on. Melendez and Peterson went

inside to "resolve their issue." Belmore then asked Schroeder to tell defendant that he had to leave as she went inside briefly to check on Melendez and Peterson.

¶ 19    When Belmore returned outside, she observed Schroeder standing in front of defendant trying to calm him down. Defendant was leaning against the back of a car parked in his garage, which had the door open. Defendant was agitated, holding a phone up to his ear and threatening to "call people over." According to Belmore, defendant indicated that he was "calling his boys" because "he didn't do anything wrong" and he did not like that he was being told that his actions were disrespectful. Schroeder explained to defendant that he just wanted defendant to leave his house. Belmore and Schroeder then returned to their unit through the garage, closing the garage door behind them. After some discussion about what had just happened, Belmore, Schroeder, Peterson, and Melendez went back to the garage to smoke, but left the garage door closed. Shortly thereafter, defendant started knocking on the garage door. Schroeder told defendant to go home and to stop knocking on his garage door.

¶ 20    Belmore, Schroeder, Peterson, and Melendez then went back inside. Belmore wanted to call the police, but the others urged her not to. At some point, Imel and Millz came to the house. When Imel and Millz arrived, Belmore went out her front door to greet them while Schroeder opened the garage door and walked through the garage to meet them. When Belmore got to the end of the sidewalk, Schroeder was already in the driveway by his and Belmore's cars. Imel and Millz had just exited their car. Belmore turned towards Imel and noticed Peterson and defendant talking, but could not hear what they were saying. Defendant was leaning up against his car which was parked in his garage. Peterson, who was dressed in only a pair of shorts, was standing two feet in front of defendant. There was no yelling between Peterson and defendant, and Peterson was not

carrying a gun or any other weapon. Moreover, Belmore did not observe Peterson make any threatening movements towards defendant.

¶ 21    Just as Belmore was ushering everyone inside, she heard a gunshot and then saw Peterson lying on the ground. Belmore testified that defendant just stood there, staring at Peterson's body on the ground while holding a gun at his side. Prior to the shooting, no one threatened defendant, said anything to him, or made any movements towards him. Moreover, Belmore testified that neither she nor Schroeder own a gun and that she did not see anyone in their group with a gun or any other type of weapon that night. Immediately after the shooting, everyone ran inside. Belmore and Melendez grabbed the babies, locked themselves in the bathroom, and called the police.

¶ 22    Imel testified that on July 1, 2017, he received a call from Schroeder. Schroeder sounded concerned over the phone. In response, Imel drove himself and Millz to Schroeder's house in Millz's car. When they arrived, there were two cars parked side-by-side in Schroeder's driveway. Imel parked Millz's car behind the car on the left side of Schroeder's driveway. After Imel and Millz exited the car, they began talking to Schroeder in the driveway. As they were making their way towards Schroeder's house, Imel saw Peterson talking to defendant in front of defendant's garage. Peterson was about five feet away from defendant. Imel did not hear any yelling or shouting between the two men. Less than a minute later, Imel heard a noise that sounded like fireworks. Imel looked to his right and saw Peterson lying on the ground. Defendant was standing by his garage. Imel, Millz, Schroeder, and Belmore rushed inside Schroeder's house, where someone called the police. According to Imel, no one ever threatened defendant or made any movements towards him before he shot Peterson. Further, Imel did not see anyone with a gun or any other type of weapon. Imel testified that he went to the house because Schroeder sounded concerned over the phone, not to fight.

¶ 23 Millz corroborated Imel's account of the shooting. Millz testified that the shooting occurred within 15 to 20 seconds after he and Imel arrived. Prior to the shooting, Millz did not hear any yelling or threats being made verbally or with a weapon. Millz added that he accompanied Imel to Schroeder's house to "steer away a possible altercation" and "calm everything down."

¶ 24 Peterson was 23 years old in July 2017 and was living with Melendez, his then girlfriend, and their infant daughter. Peterson remembered only bits and pieces of what happened on the day of the shooting. He recalled that he went to visit his friends, Schroeder and Belmore, at their home. Melendez was angry and yelled at him for not sticking up for her because of the way defendant was treating her. At one point, Peterson got tired of Melendez yelling at him, so he left Schroeder's house and went to speak to defendant, who was in his driveway. Peterson did not have a gun or any other type of weapon with him. The only thing Peterson said to defendant was that he "didn't really appreciate the sexual remarks that [defendant] was making to [Melendez]." That was the last thing Peterson recalled about that night. Peterson did not remember if defendant said anything in response, and he did not see a gun. Peterson testified that he was shot in the right eye. The bullet travelled through the right side of his brain. Due to the injuries he sustained in the shooting, Peterson is unable to voluntarily move his left arm or left leg. In addition, he is unable to walk, he is confined to a wheelchair, and he has a glass right eye. At the time of trial, Peterson was living with his mother and siblings.

¶ 25 Officer Keith Rominski of the Sandwich Police Department testified that he and Officers Marcellis and Russell responded to the shooting at around 12:30 a.m. on July 2, 2017. The officers arrived in separate cars, turned off their lights as they got close, and parked a short distance away from defendant's residence. The officers walked up to defendant's driveway looking for a house

number. Rominski described the scene upon his arrival as unusually quiet. He found it odd that there was no one around to flag them down or direct them to the exact location.

¶ 26    Rominski discovered Peterson's body on the ground just outside defendant's garage. Rominski testified that he almost tripped over Peterson's body looking for the right house number. Peterson was laying with his feet towards the garage and his head towards the street. Peterson had a golf-ball-sized lump to his right eye. There was a pool of blood around Peterson's head. Both defendant's and Schroeder's garage doors were open when the officers arrived. Rominski and his partners saw defendant moving around in his unit just inside the storm door leading from his unit to the garage. Rominski and his partners announced their office several times as they moved closer to defendant's storm door. Defendant then came out of his unit and met the officers. Defendant told the officers that everything was okay and that he shot Peterson. As the officers attempted to handcuff defendant, he resisted and stated that he was "defending himself" and that somebody called "20 gangbangers to come jump [him]." Defendant elaborated that "four cars rolled up, 20 deep, and they were Mexican gangbangers that came to jump him and break into his house." Defendant was taken into custody, and the police began processing the crime scene.

¶ 27    Rominski stated that he and Officer Marcellis arrived at the scene within three minutes of the dispatch. Upon his arrival, Rominski did not see carloads of people leaving or "20 Mexican gangbangers." On cross-examination, Rominski acknowledged that if a vehicle had left the premises prior to his arrival, he would have no way of knowing about it.

¶ 28    Jason Weiss testified that in July 2017, he lived on Lilian Lane in Sandwich. In the late evening hours of July 1, 2017, and the early morning hours of July 2, 2017, Weiss was in his driveway cleaning up fireworks. Around midnight, Weiss heard what sounded like someone banging on a garage door followed by male voices talking. At some point, Weiss looked over and

saw defendant and Peterson conversing. Peterson and defendant were about 60 to 80 yards away from Weiss. Weiss did not know Peterson, but he was familiar with defendant from the neighborhood. Weiss subsequently heard a gunshot. When he looked in the direction of the gunshot, he saw defendant standing near Peterson's body, which was on the ground. Weiss ran home and told his wife to lock up the house. Prior to the shooting, Weiss saw only one car pull up to the area. Weiss denied seeing "four carloads of people" or "20 Mexican gangbangers" in the area. On cross-examination, Weiss testified that he may have told the police that, after the shooting, he saw cars leave and pull up without headlights on. He also stated that the voices he heard sounded "aggressive," but it did not look as if there was a fight. On redirect-examination, Weiss testified that the cars he was referring to were police cars. Weiss testified that prior to the shooting he did not see any cars other than those being used by the neighbors who were moving in.

¶ 29    Officer Jackie Hill, a detective with the De Kalb County Sheriff's Department, testified that in the early morning hours of July 2, 2017, she was dispatched to a shooting on Lillian Lane in Sandwich. Hill's task was to collect the evidence. Hill found biological matter on defendant's driveway near where Peterson's body was found, on the passenger sides of Belmore's and Millz's cars, and at the end of defendant's driveway. Hill recovered the bullet that went through Peterson's head from the exterior garage wall of a house across the street from defendant's residence.

¶ 30    Christina Davison, a forensic scientist employed by the Illinois State Police and specializing in firearms identification, testified that the bullet collected by Hill matched a 9 mm Glock that was recovered from defendant's kitchen counter after his arrest.

¶ 31    The parties stipulated that Peterson was treated in the emergency room at Valley West Hospital for a gunshot wound near his right eye. Peterson also had a large open wound on the back of his scalp with large amounts of gray matter protruding therefrom. When he arrived at Valley

West Hospital, Peterson was comatose and unresponsive. Peterson was airlifted from Valley West Hospital to St. Anthony Hospital in Rockford, where he remained for over a month. On July 2, 2017, Peterson underwent a right decompressive hemicraniectomy, a procedure in which part of his skull was removed to allow his brain to swell without being squeezed. On the same date, Peterson also underwent a right eye enucleation, *i.e.*, the surgical removal of his right eyeball. On August 9, 2017, Peterson underwent a cranioplasty, the implantation of an artificial skull to replace the portion of the skull that had been removed during the right decompressive hemicraniectomy. On August 18, 2017, Peterson was transferred from St. Anthony Hospital to the Rehabilitation Institute of Chicago for their traumatic brain program.

¶ 32    The sole witness for the defense was Officer Jennifer Marcellis of the Sandwich Police Department. Marcellis was one of the officers who first responded to the shooting. Marcellis related that defendant complied with instructions to come out of his house and was cooperative after that. On cross-examination, Marcellis testified that when she approached defendant's residence, there was a body lying on the driveway outside of defendant's garage. The body was later identified as that of Peterson. Peterson was barefoot. He was wearing red basketball shorts but no shirt. Marcellis did not see any weapons on or near Peterson's body. There was a pool of blood around Peterson's head. His right eye socket was purple and swollen. Moreover, the wound to Peterson's head was leaking a combination of blood and brain matter. Following Marcellis's testimony, the defense rested.

¶ 33    During the instructions conference, defendant asked that the jury be instructed on the use of force in defense of a dwelling in accordance with Illinois Pattern Jury Instructions, Criminal, No. 24-25.07 (hereinafter IPI Criminal No. 24-25.07). As tendered, defendant's proposed instruction read:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to prevent another's unlawful entry into a dwelling. However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if the entry is made or attempted in a violent, riotous, or tumultuous manner and he reasonably believes that such force is necessary to prevent an assault upon or offer of personal violence to himself or another then in the dwelling."[1]

Defendant argued that the instruction was appropriate because there was some evidence presented at trial to support it. Specifically, the defense asserted that numerous witnesses for the State testified that defendant was within his garage at the time "this attack occurred." Citing *People v. Sawyer*, 115 Ill. 2d 184 (1986), the court stated that the defense-of-dwelling instruction is justified if (1) the victim's entry was made in a violent, riotous, or tumultuous manner and (2) the defendant reasonably believes that deadly force is necessary to prevent an assault upon, or offer of personal violence to, him or another in the dwelling. The defense responded that actual entry is not necessary and the instruction may be given where force is used "to either prevent or terminate the entry." The defense further argued that the tumultuous-manner element "would be the additional people called to the scene" as supported by the testimony of Belmore as well as Weiss's testimony that he heard aggressive voices. The State objected to the instruction. The State argued that, at

---

[1] As noted earlier, prior to trial, defendant filed a notice of intent to rely upon the affirmative defenses of justifiable use of force in defense of a dwelling pursuant to sections 7-2(a)(1) and 7-2(a)(2) of the Code (720 ILCS 5/7-2(a)(1), (a)(2) (West 2016)). We note, however, that the tendered instruction tracks only section 7-2(a)(1) of the Code (720 ILCS 5/7-2(a)(1) (West 2016)).

best, there was evidence that Peterson and defendant "were having some sort of verbal exchange, perhaps it was yelling, perhaps it was not," but there was no evidence that Peterson tried to unlawfully enter defendant's garage or home, much less that he did so in a tumultuous manner. The trial court sustained the State's objection, ruling that there was insufficient evidence "to give rise to an attempted entry of a violent or riotous or tumultuous manner by Mr. Peterson or the other persons present." Although the court denied the defense-of-a-dwelling instruction, it agreed to give defendant's requested self-defense instruction. The defense did not ask for an imperfect self-defense instruction.

¶ 34    Following deliberations, the jury found defendant guilty of all seven offenses with which he was charged. The jury also found that defendant was armed with a firearm and that he personally discharged a firearm that proximately caused great bodily harm, permanent disability, or permanent disfigurement.

¶ 35    On July 17, 2019, defendant filed a motion for judgment notwithstanding the verdict and a motion for a new trial. In the former motion, defendant argued that he presented numerous witnesses to support his statement that he was acting in self-defense and the State failed to prove beyond a reasonable doubt that defendant did not act in self-defense. Thus, defendant reasoned, the evidence was insufficient to support a finding of guilty even if taken in the light most favorable to the State. In the latter motion, defendant argued, *inter alia*, that the trial court erred in failing to give his requested instruction on the use of force in defense of a dwelling. Following oral argument, the trial court denied both motions. The court then determined that, under one-act, one-crime principles, all the offenses of which defendant was convicted merged into count 4 of the indictment, which charged attempt (first-degree murder) in that defendant personally discharged a

firearm which proximately caused great bodily harm, permanent disability, or permanent disfigurement.

¶ 36                                    B. Sentencing

¶ 37    Defendant's sentencing hearing was held on August 2, 2019. At the hearing, the State presented the testimony of Kelly Blum, Peterson's mother. Blum testified regarding the changes to Peterson following the shooting. Blum testified that Peterson's speech pattern is slower, he has difficulty getting out what he wants to say, he cannot walk, and his personality is not as vibrant as it was prior to the shooting. Further, Blum testified that Peterson is missing a portion of the right side of his brain, resulting in cognitive deficits and short-term memory problems. Blum also testified that Peterson is frustrated because he is unable to do normal things with his daughter, such as pick her up, make her dinner, give her a bath, or chase after her. Following Blum's testimony, the State introduced into evidence pictures of Peterson before and after the accident. Thereafter, Blum, Peterson, Peterson's father, and Peterson's two sisters read victim-impact statements into the record. Defendant presented letters written from various family members and friends. The parties then presented oral argument, during which they discussed the statutory factors in mitigation and aggravation (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2016)) and made sentence recommendations. The State requested a sentence of 50 years' imprisonment (25 years for attempt (first-degree murder) plus a 25-year firearm enhancement). The defense requested a sentence of 31 years' imprisonment (6 years for attempt (first-degree murder) plus a 25-year firearm enhancement). Defendant declined the opportunity to make a statement in allocution.

¶ 38    In pronouncing sentence, the court stated that it had considered the factors in aggravation and mitigation, the arguments of counsel, the applicable law, the financial impact of incarceration, the evidence introduced at the sentencing hearing, and the presentence investigation (PSI) report.

The court reviewed defendant's family history, noting that he was raised primarily by his mother, has one brother and three stepsiblings, is not married, and has no children. The court also noted that defendant is a high-school graduate, has been gainfully employed most of his adult life, and has no health problems. In addition, the court noted that defendant has continued his education while in jail and obtained certificates of study. The court reviewed the PSI report, noting that defendant's prior criminal history included a driving-under-the-influence (DUI) conviction from six years earlier as well as some other offenses that were older than the DUI. With respect to defendant's attitude regarding the offense at issue, defendant told a probation officer that he provided several warnings before discharging the gun and that he was defending himself and his property. However, the court found that there was no evidence to suggest that defendant warned Peterson before shooting him in the face. Defendant also told the probation officer that he had been "railroaded," and that the conviction was "way overdone." The court found defendant had not been "railroaded," and characterized his attitude as "troubling." The court noted that whereas defendant can walk, Peterson "has been sentenced to a lifetime in a wheelchair" and was "robbed *** of the opportunity to be a meaningful father" to his daughter.

¶ 39    With respect to the statutory factors in mitigation, the court characterized defendant's history of prior delinquency or criminal activity as "minor, and most of it is extremely old." See 730 ILCS 5/5-5-3.1(a)(7) (West 2016). The court also found that defendant's criminal conduct was a result of circumstances unlikely to recur. See 730 ILCS 5/5-5-3.1(a)(8) (West 2016). In this regard, the court stated that "the situation that occurred as [defense counsel] described it in terms of what was going on that day, the alcohol consumed, the situation involving the women that were there, I do think created a unique circumstance." The court found that the remaining factors in mitigation did not apply. See 730 ILCS 5/5-5-3.1 (West 2016). With respect to the factors in

aggravation, the court found that defendant's conduct caused or threatened serious harm. 730 ILCS 5/5-5-3.2(a)(1) (West 2016). The court remarked that Peterson "has suffered about as extreme amount of great bodily harm as a person could suffer without losing his life." The court pointed out that Peterson lost an eye and a portion of his skull and he is paralyzed. Regarding whether the sentence is necessary to deter others from committing the same crime (730 ILCS 5/5-5-3.2(a)(7) (West 2016)), the court remarked:

"I don't think people sit there and say to themselves well, I'm not going to do this because I saw the sentence that [defendant] got, and so therefore, even though I've been drinking all night, and even though I'm upset about something that's occurred, I'm not going to shoot this guy in the face ***. I don't know that that necessarily deters anybody.

That being said, I think that the Court is duty bound to at least acknowledge and make sure the community understands that when people get involved in this activity, this type of activity, there are going to be significant consequences that arise out of that, and so I do think *** [this factor] does apply."

Ultimately, the trial court sentenced defendant to a prison term of 45 years, which included a mandatory 25-year firearm enhancement. 720 ILCS 5/8-4(c)(1)(D) (West 2016). Defendant subsequently filed a motion to reconsider sentence, which the trial court denied on February 10, 2020. This appeal ensued.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, defendant raises three distinct issues. First, he argues that he was denied the effective assistance of counsel where counsel failed to request an instruction on the unreasonable belief in self-defense concerning the attempt (first-degree murder) charges. Second, he argues that the trial court abused its discretion when it refused to instruct the jury on defense of dwelling

because there was some evidence presented at trial to support such an instruction. Third, he argues that the sentence imposed by the trial court was excessive. We address each issue in turn.

¶ 42                              A. Ineffective Assistance of Counsel

¶ 43    Defendant initially asserts that he received ineffective assistance of counsel because his trial attorneys failed to request an instruction on the unreasonable belief in self-defense. According to defendant, if the jury found that he unreasonably believed that he needed to act in self-defense, there is a reasonable probability that the jury would have acquitted him of the attempt (first-degree murder) charges as an unreasonable belief in self-defense negates the specific intent to commit an unjustified killing that is an element of attempt (first-degree murder). Consequently, defendant urges this court to reverse his conviction of attempt (first-degree) murder and remand the matter for a new trial before a properly instructed jury. In so arguing, defendant acknowledges that in *People v. Guyton*, 2014 IL App (1st) 110450, the court held that a defendant acting in unreasonable self-defense can still be convicted of attempt (first-degree murder) because there is no offense of attempt (second-degree murder) in Illinois. However, defendant contends that *Guyton* was wrongly decided and that its rationale is undermined by the supreme court's holdings in *People v. Lopez*, 166 Ill. 2d 441 (1995), and *People v. Reagan*, 99 Ill. 2d 238 (1983).

¶ 44    In response, the State asserts that defendant's argument should be rejected for two reasons. Relying on *Guyton*, 2014 IL App (1st) 110450, the State first contends that defense counsel's performance was not deficient where the law does not support defendant's proposed instruction. Second, the State contends that defendant cannot establish prejudice where the evidence supporting an actual belief in self-defense was nonexistent. As such, the State concludes that defendant has not established ineffective assistance of counsel and his conviction of attempt (first-degree murder) should be affirmed.

¶ 45    A criminal defendant is guaranteed the right to the effective assistance of counsel by both the United States and Illinois Constitutions. U.S. Const., amend. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Peterson*, 2017 IL 120331, ¶ 79. Claims that counsel provided ineffective assistance are evaluated under the familiar two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To prevail on an ineffective-assistance-of-counsel claim, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687-88; *People v. Johnson*, 2021 IL 126291, ¶ 52. A defendant must satisfy both prongs of the *Strickland* test to prevail on a claim of ineffective assistance of counsel. *People v. Flores*, 153 Ill. 2d 264, 283 (1992). Reviewing courts measure counsel's performance by an objective standard of competence under prevailing professional norms. *People v. Spiller*, 2016 IL App (1st) 133389, ¶ 36. To establish deficient performance, defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *Spiller*, 2016 IL App (1st) 133389, ¶ 36. To show prejudice, a defendant must establish that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Johnson*, 2021 IL 126291, ¶ 52. Where, as here, the claim of ineffective assistance of counsel was not raised in the trial court, our review is *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 46    Pursuant to section 8-4(a) of the Code, "[a] person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense."  720 ILCS 5/8-4(a) (West 2016). In this case, the State charged defendant with attempt (first-degree murder). A defendant commits first-degree murder if

he or she kills an individual without lawful justification and, in performing the acts which caused the death, the defendant intended to kill or do great bodily harm or knew that his acts created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2016); *Guyton*, 2014 IL App (1st) 110450, ¶ 37. Thus, the State was required to prove that defendant "performed an act that constituted a substantial step toward the commission of first-degree murder and that [he] did so with the specific intent to kill the victim." 720 ILCS 5/8-4(a) (West 2016); *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 34; *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. In this case, the jury rejected defendant's self-defense claim, found that the State met its burden of proof, and convicted defendant of attempt (first-degree murder).

¶ 47 Defendant points out that an offender may mitigate the offense of first-degree murder to second-degree murder by proving the existence of a statutory mitigating factor by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2016). The statutory mitigating factors to which defendant refers are serious provocation or imperfect self-defense. 720 ILCS 5/9-2(a) (West 2016); *People v. Jeffries*, 164 Ill. 2d 104, 112-13 (1995). The imperfect self-defense form of second-degree murder occurs when there is sufficient evidence that the defendant believed that he was acting in self-defense, but his belief was objectively unreasonable. 720 ILCS 5/9-2(a) (West 2016); *Jeffries*, 164 Ill. 2d at 113. Defendant suggests that because the legislature allows for mitigation from first-degree murder to second-degree murder where there is evidence of an unreasonable belief in the need to use deadly force in self-defense, a defendant should also be allowed to mitigate a charge of attempt (first-degree murder). According to defendant if he believed he was acting lawfully in self-defense when he shot Peterson, even if his belief was unreasonable, he lacked the specific intent to kill without justification, which is required for attempt (first-degree murder). Thus, defendant reasons, his attorneys should have requested an instruction on imperfect self-

defense to the attempt (first-degree murder) charges, instructing the jury to acquit him if it found that he acted with an unreasonable belief in the need for self-defense.

¶ 48    As noted, defendant relies on *Reagan*, 99 Ill. 2d 238, and *Lopez*, 166 Ill. 2d 441, in support of his position. In *Reagan*, the supreme court held that there was no crime of attempt (voluntary manslaughter) based on an unreasonable belief in self-defense. *Reagan*, 99 Ill. 2d at 240. The court explained that the attempt statute provides that " '[a] person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense.' " *Reagan*, 99 Ill. 2d at 240 (quoting Ill. Rev. Stat. 1979, ch. 38, par. 8-4(a)). Based on that statute, attempt (voluntary manslaughter), however, would require the defendant to specifically intend to kill without lawful justification and with an unreasonable belief in the need to use deadly force in self-defense. *Reagan*, 99 Ill. 2d at 240. Because it is impossible to intend an unreasonable belief, the court held that attempt (voluntary manslaughter) based on imperfect self-defense could not exist. *Reagan*, 99 Ill. 2d at 240.

¶ 49    In *Lopez*, 166 Ill. 2d 441 (1995), the defendant was charged with, *inter alia*, attempt (first-degree murder). He requested an instruction on attempt (second-degree murder) based on imperfect self-defense, *i.e.*, the unreasonable belief in the need to use deadly force. The trial court rejected the instruction, finding there was no crime of attempt (second-degree murder) in Illinois. The jury returned a verdict of guilty, and the defendant appealed. On appeal, the defendant argued that the trial court erred in rejecting his requested instruction because attempt (second-degree murder) is an offense recognized in Illinois. The supreme court affirmed. The court noted that for a defendant to commit attempt, he must intend to commit a specific offense. *Lopez*, 166 Ill. 2d at 448. The court further noted that to commit second-degree murder, a defendant must have acted under a sudden and intense passion due to serious provocation or an unreasonable belief in the

need to use deadly force. *Lopez*, 166 Ill. 2d at 448. The court determined that a person cannot intend either of these things, and so, under the Illinois attempt statute, no crime of attempt (second-degree murder) exists. *Lopez*, 166 Ill. 2d at 449.

¶ 50 More recently, in *Guyton*, 2014 IL App (1st) 110450, the court held that a defendant could not mitigate an attempt (first-degree murder) conviction based on an unreasonable belief in the need for self-defense. In that case, the State charged the defendant with various offenses, including first-degree murder of one victim and attempt (first-degree murder) of another victim. At trial, the defendant argued that he acted in self-defense when he shot the two victims. As to the victim that died, the jury found the defendant guilty of second-degree murder based on an imperfect self-defense, *i.e.*, an unreasonable belief in the need to use deadly force in self-defense. As to the victim that survived, the jury found the defendant guilty of attempt (first-degree murder).

¶ 51 On appeal, the defendant contended that because he fired simultaneously at the two victims, he could not have had an unreasonable belief in the need for self-defense as to the victim that was killed, but not as to the victim that survived. Thus, the defendant contended, his conviction of attempt (first-degree murder) must be vacated. The *Guyton* court rejected the defendant's argument. The court observed that the mental state required to prove attempt (first-degree murder) and second-degree murder are the same. *Guyton*, 2014 IL App (1st) 110450, ¶ 41. Although second-degree murder requires the presence of a mitigating circumstance, the court noted that the presence of a mitigating factor does not negate the mental state of murder because mitigating factors are not elements of the crime. *Guyton*, 2014 IL App (1st) 110450, ¶ 41. The court further explained:

"The evidence established, and the jury found, the intent required to sustain an attempted first-degree murder conviction. The determination by the jury that mitigating

circumstances existed allowed for a conviction of a lesser second degree murder offense because of defendant's unreasonable belief in the need to defend does not invalidate the attempted murder conviction." *Guyton*, 2014 IL App (1st) 110450, ¶ 46.

The court further found that, pursuant to *Lopez*, 166 Ill. 2d 441 (1995), there is no offense of attempt (second-degree murder) in Illinois. *Guyton*, 2014 IL App (1st) 110450, ¶ 42. The court also observed that, in response to *Lopez*, the legislature could have addressed the issue of whether imperfect self-defense constitutes a mitigating factor for attempted murder, but chose not to. *Guyton*, 2014 IL App (1st) 110450, ¶ 45. Thus, the court reasoned, the legislature's inaction suggested agreement with the judicial interpretation of *Lopez. Guyton*, 2014 IL App (1st) 110450, ¶ 45. In short, the court determined that even though the jury's verdict on second-degree murder revealed that it found the defendant acted in imperfect self-defense, the jury could not have been instructed on and could not have found the defendant guilty of attempted second-degree murder. *Guyton*, 2014 IL App (1st) 110450, ¶ 46.

¶ 52     Thus, pursuant to *Guyton*, when a jury finds that the evidence establishes that the defendant committed the offense of attempt (first-degree murder), as in the instant case, a defendant's ability to establish his unreasonable belief in the need for self-defense is irrelevant because the attempt statute does not provide for mitigation based on imperfect self-defense. Stated differently, under the current statutory scheme, the legislature has not provided for the affirmative defense of unreasonable belief in self-defense in cases of attempt (first-degree murder). Defense counsel recognized as much at the sentencing hearing, noting the "odd dichotomy in cases like this" in that if Peterson had died, "there would have been an argument for second-degree murder, in that his belief in defense, though held, was not reasonable."

¶ 53    Defendant suggests that *Guyton* was wrongly decided, citing *Reagan*, 99 Ill. 2d 238 (1983), and *Lopez*, 166 Ill. 2d 441 (1995), as support. However, neither *Reagan* nor *Lopez* stands for the proposition that a defendant who established an unreasonable need in self-defense cannot be convicted of attempt (first-degree murder). To the contrary, when a jury finds sufficient evidence to convict a defendant of attempt (first-degree murder), it necessarily finds that the defendant had the specific intent to commit first-degree murder, which cannot then be mitigated by the defendant's unreasonable belief in the need for self-defense. *Guyton*, 2014 IL App (1st) 110450, ¶ 46.

¶ 54    We also point out that the legislature has not chosen to allow a defendant to mitigate the offense of attempt (first-degree murder) based on an imperfect self-defense claim, although it amended the attempt (first-degree murder) statute to allow a defendant to mitigate the offense if it resulted from provocation. See Pub. Act 96-710 (eff. Jan. 1, 2010) (amending 720 ILCS 5/8-4). Specifically, under section 8-4(c)(1)(E) of the Code, a defendant convicted of attempt (first-degree murder) is allowed to prove at sentencing, by a preponderance of the evidence, that the mitigating factor of provocation was present, so as to reduce the class of the offense from Class X to Class 1. 720 ILCS 5/8-4(c)(1)(E) (West 2016); *Guyton*, 2014 IL App (1st) 110450, ¶¶ 44, 61. As the court in *Guyton* observed, the legislature has, by its inaction, provided that a defendant acting under imperfect self-defense can nonetheless be convicted of attempt (first-degree murder). *Guyton*, 2014 IL App (1st) 110450, ¶¶ 45-46. More than seven years has elapsed since the *Guyton* court made these observations, yet the legislature has yet to amend the attempt statute to allow proof of imperfect self-defense as a basis for mitigation of a sentence for the crime of attempt (first-degree murder). See *Guyton*, 2014 IL App (1st) 110450, ¶ 45 (inviting the legislature to amend the attempt statute should it disagree with judicial interpretation). Thus, we reject defendant's assertion that

the holdings in *Reagan* and *Lopez* necessitate a different outcome in this case, as the holding in *Guyton* is not inconsistent with either case.

¶ 55    Given the foregoing, we reject defendant's contention that his trial attorneys were ineffective. As discussed above, a defendant cannot mitigate an attempt (first-degree murder) charge based on an unreasonable belief in the need for self-defense. Consequently, counsel's decision not to request an instruction informing the jury that defendant should be acquitted if it found that he acted with an unreasonable belief in self-defense was reasonable. See *Guyton*, 2014 IL App (1st) 110450, ¶ 46. Because both prongs of the *Strickland* test must be satisfied, defendant's failure to establish that trial counsel's performance fell below an objective standard of reasonableness is fatal to his ineffective assistance of counsel claim. *Flores*, 153 Ill. 2d at 283.

¶ 56                                B. Defense-of-A-Dwelling Instruction

¶ 57    Next, defendant argues that the trial court abused its discretion when it refused to instruct the jury on use of force in defense of a dwelling. "The purpose of jury instructions is to provide jurors with correct principles of law that apply to the evidence that has been submitted to them." *People v. Bauer*, 393 Ill. App. 3d 414, 423 (2009). A defendant is entitled to an instruction on his or her theory of the case where there is some foundation for the instruction in the evidence. *People v. Jones*, 219 Ill. 2d 1, 21 (2006). The threshold of evidence required to raise an affirmative defense is low. *People v. Kite*, 153 Ill. 2d 40, 45 (1992). Generally, the defendant bears the burden to present evidence in support of his or her theory of the case, and where the defendant does not present supporting evidence, the proffered instruction should be refused. *Kite*, 153 Ill. 2d at 45. However, where the evidence presented by the State raises the issue of the affirmative defense, the defendant will be excused from presenting any evidence thereon. *People v. Jones*, 175 Ill. 2d 126, 132 (1997). The trial court's decision to give a jury instruction is reviewed for an abuse of

discretion. *Jones*, 175 Ill. 2d at 132. An abuse of discretion occurs when " 'the trial court's decision is arbitrary, fanciful, or unreasonable, to the degree that no reasonable person would agree with it.' " *People v. Fane*, 2021 IL 126715, ¶ 48 (quoting *People v. King*, 2020 IL 123926, ¶ 35); *People v. Najar*, 2018 IL App (2d) 160919, ¶ 18.

¶ 58 As noted, defendant argues that the trial court abused its discretion when it refused his tendered instruction on use of force in defense of a dwelling. Defendant argues that evidence was presented that he was standing in his garage at the time of the shooting, tensions were high after he was asked to leave Schroeder's garage, Peterson went to his open garage uninvited to confront him about his conduct towards Melendez earlier in the evening, and Schroeder, Imel, and Millz stood nearby in Schroeder's driveway "apparently as reinforcements for [Peterson] if needed." According to defendant, this evidence was sufficient to put the question of defense of dwelling before the jury because it constituted evidence of "tumult" coupled with a reasonable fear of an assault or use of violence in the dwelling. Defendant therefore insists that the trial court abused its discretion when it refused to instruct the jury on the use of force in defense of a dwelling.

¶ 59 The State's response is two-fold. First, the State argues that there was "zero evidence" adduced at trial to establish either of the necessary prongs to warrant a use-of-force-in-defense-of-a-dwelling instruction. Second, the State contends that because the defense theories of self-defense and of defense of dwelling were so intertwined, and because the jury was instructed on and rejected defendant's self-defense claim, any error in the trial court's decision not to give the use-of-force-in-defense-of-a-dwelling instruction was harmless.

¶ 60 Defendant's proposed instruction tracked section 7-2(a)(1) of the Code (720 ILCS 5/7-2(a) (West 2016)), which provides:

"(a) A person is justified in the use of force against another when and to the

extent that he reasonably believes that such conduct is necessary to prevent or

terminate such other's unlawful entry into or attack upon a dwelling. However, he

is justified in the use of force which is intended or likely to cause death or great

bodily harm only if:

(1) The entry is made or attempted in a violent, riotous, or

tumultuous manner, and he reasonably believes that such force is necessary

to prevent an assault upon, or offer of personal violence to, him or another

then in the dwelling." 720 ILCS 5/7-2(a)(1) (West 2016).

The supreme court has distilled the requirements of this statutory defense into two requirements.

*Sawyer*, 115 Ill. 2d at 192. First, the victim's entry or attempted entry must be made in a "violent,

riotous, or tumultuous manner." 720 ILCS 5/7-2(a)(1) (West 2016); *Sawyer*, 115 Ill. 2d at 192.

Second, the defendant's subjective believe that force is necessary to prevent an assault upon, or an

offer of personal violence to, him or another in the dwelling must be reasonable. 720 ILCS 5/7-

2(a)(1) (West 2016); *Sawyer*, 115 Ill. 2d at 192. All the surrounding circumstances are relevant in

assessing whether a defendant's beliefs regarding defense of a dwelling were reasonable. *Sawyer*,

115 Ill. 2d at 193.

¶ 61    We hold that the trial court did not abuse its discretion in refusing defendant's proposed

instruction on defense of dwelling because there was not even slight evidence to support this

affirmative defense. To begin, there was no evidence that Peterson or anyone else entered or

attempted to enter defendant's dwelling unlawfully. Peterson approached defendant simply to tell

him that he did not appreciate the remarks defendant had made to Melendez. At the time, Peterson

was outside defendant's garage while defendant was standing just inside the garage. The distance

between the two men was between two and five feet. There was no evidence that Peterson tried to enter defendant's home or that he made any movements toward defendant or the home prior to the shooting. Likewise, there was no evidence that either Schroeder, Belmore, Melendez, Imel, or Millz tried to enter defendant's home or made any threatening movements toward defendant or the home prior to the shooting. Defendant insists that the question of whether Peterson attempted to enter his dwelling was a factual question for the jury to decide. However, there must be at least some evidence of an entry or attempted entry before the issue becomes a factual question for the jury. *Kite*, 153 Ill. 2d at 46. In this case, there was no evidence of any entry or attempted entry by Peterson or anyone else. Thus, there was no factual issue for the jury to resolve.

¶ 62    Additionally, there was no evidence of any "violent, riotous, or tumultuous" behavior by Peterson or any of the other individuals present. As noted above, Peterson approached defendant simply to tell him that he did not appreciate the remarks defendant had made to Melendez. Peterson testified that when he approached defendant, he did not have a gun or any other type of weapon with him. Peterson's testimony that he was unarmed was corroborated by several of the State's other witnesses and by Officer Marcellis, who testified that she did not see any weapons on or near Peterson's body at the scene. Similarly, the evidence reflects that neither Schroeder, Belmore, Melendez, Imel, nor Millz were armed with a weapon. In addition, the State's witnesses testified that they did not hear any yelling or shouting between Peterson and defendant prior to the shooting and that no one threatened defendant, walked towards him, or rushed him. Despite this record, defendant, relying on a dictionary definition of "tumult" (Merriam-Webster's Dictionary and Thesaurus (2007), 854), insists that when Peterson approached him, the circumstances presented "a state of commotion, excitement or agitation, particularly where [Peterson] had reinforcements standing just feet away at the ready." We disagree. As noted above, prior to the shooting, there

was no evidence of any yelling or shouting between Peterson and defendant. Nor was there evidence that Peterson, Schroeder, Belmore, Melendez, Imel, or Millz was armed, that anyone made any threats to defendant, or that anyone made any sudden movements toward defendant. Although Weiss described the tone of Peterson's and defendant's voices as "aggressive," he also stated that it did not look as if there was a fight. Quite simply, the record is devoid of evidence of the type of commotion, excitement, or agitation to which defendant refers.

¶ 63    Failure to prove an entry or an attempted entry made in a violent, riotous, or tumultuous manner obviates the need to conduct an inquiry into the second prong of the defense. Nevertheless, there was no evidence that defendant had a reasonable, subjective belief that deadly force was necessary to prevent an assault upon, or an offer of personal violence to, him. *Sawyer*, 115 Ill. 2d at 192. The only evidence of defendant's actual subjective belief came from Officer Rominski's testimony. Rominski testified that as the officers attempted to handcuff defendant at the scene, he resisted and stated that he was "defending himself" because "four cars rolled up, 20 deep, and they were Mexican gangbangers that came to jump him and break into his house." However, there was no evidence to corroborate defendant's statements. Rominski testified that he arrived within three minutes of being dispatched and did not see carloads of people leaving or "20 Mexican gangbangers." Similarly, Weiss, a neighbor, denied seeing "four carloads of people" or "20 Mexican gangbangers" in the area. Weiss further testified that prior to the shooting, he did not see any cars other than those being used by the neighbors who were moving in. Schroeder testified that there were only three cars in his driveway near the time of the shooting—his car, Belmore's car, and the car driven by Imel. Schroeder further testified that no other cars arrived at his house prior to the shooting and no other persons arrived. Imel's testimony corroborated that of Schroeder.

¶ 64    Defendant nevertheless insists that because Peterson "confronted him" about Melendez and Schroeder, Imel, and Millz were standing just feet away in Schroeder's driveway, there were "renewed tensions and conduct that placed [him] in reasonable apprehension of receiving a battery." As noted above, however, there was no evidence that Peterson approached defendant in a confrontational manner. Peterson simply told defendant that he did not appreciate how defendant talked to Melendez. There was no yelling or shouting between the men. Further, there was no evidence that Peterson was carrying a gun, that he threatened defendant in any way, or that he made any sudden movements toward defendant prior to the shooting. Likewise, there was no evidence that Schroeder, Imel, or Millz was carrying a weapon, had threatened defendant, or rushed toward defendant prior to the shooting.

¶ 65    Citing to *People v. Stombaugh*, 52 Ill. 2d 130, 137-38 (1972), defendant contends that an intruder's entry or attempted entry need not be forcible and that a person is justified in using deadly force to defend his dwelling *before* the intruder reaches the dwelling to prevent his entry. Defendant's reliance on *Stombaugh* is misplaced for two principal reasons. First, the shooting in *Stombaugh* occurred after the intruder forcibly entered the dwelling. *Stombaugh*, 52 Ill. 2d at 134. In this case, there was no evidence that Peterson or anyone else entered or attempted to enter defendant's dwelling unlawfully. Second, the intruder in *Stombaugh* had a history of violence against his wife and the shooter. This history included stalking, violent attacks against the wife and shooter, and repeated threats to kill both the wife and the shooter. *Stombaugh*, 52 Ill. 2d at 132-135. Defendant points to no such conduct by Peterson, Schroeder, or anyone else in this case that would give defendant reason to believe that shooting Peterson was necessary to prevent an assault upon, or offer of personal violence to, him.

¶ 66    In sum, because defendant failed to provide even some evidence warranting the issuance of a defense-of-dwelling instruction, we conclude that the trial court did not abuse its discretion when it did not instruct the jury on the affirmative defense of defense of dwelling.

¶ 67                                  C. Sentencing

¶ 68    Finally, defendant contends that the 45-year sentence imposed by the trial court was excessive. Defendant maintains that there was no reason for the trial court to sentence him to more than the minimum 6-year sentence for attempt (first-degree murder) plus the 25-year firearm enhancement, for a total of 31 years' imprisonment, where he had no prior serious criminal background, he had been gainfully employed his entire adult life, he had strong support from family and friends who vouched for his character, and his criminal conduct was a result of circumstances unlikely to recur. The State responds that the trial court did not abuse its discretion in sentencing defendant to a term of 45 years' imprisonment given the seriousness of the offense.

¶ 69    A trial court has broad discretion in imposing a sentence, and its sentencing decisions are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). As such, sentences within the permissible statutory range may be deemed an abuse of discretion only where they are greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Alexander*, 239 Ill. 2d at 212. The trial court's responsibility is to balance the relevant factors and make a reasoned decision as to the appropriate punishment in each case. *People v. Latona*, 184 Ill. 2d 260, 272 (1998). The trial court has a far better opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Alexander*, 239 Ill. 2d at 213. A sentence must be based on the particular circumstances of each case and depends on many factors, including a defendant's criminal history and the need to protect the public and deter crime. *People v. McGee*, 2020 IL App

(2d) 180998, ¶ 8. The reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed the sentencing factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 70    Moreover, in imposing a sentence, the weight to be attributed to each factor in aggravation and mitigation depends upon the circumstances of the case. *People v. Kozlow*, 301 Ill. App. 3d 1, 8 (1998). While a sentencing court " 'may not refuse to consider relevant evidence presented in mitigation' " (*People v. Calhoun*, 404 Ill. App. 3d 362, 386 (2010) (quoting *People v. Heinz*, 391 Ill. App. 3d 854, 865 (2009)), it "has no obligation to recite and assign value to each factor presented at a sentencing hearing" (*People v. Hill*, 408 Ill. App. 3d 23, 30 (2011)). Where mitigating evidence was before the court, we presume that the sentencing judge considered the evidence, absent some indication to the contrary other than the sentence itself. *People v. Allen*, 344 Ill. App. 3d 949, 959 (2003).

¶ 71    In this case, defendant was convicted of attempt (first-degree murder). 720 ILCS 5/8-4, 9-1 (West 2016). A defendant convicted of that offense faces a prison term between 6 and 30 years. 720 ILCS 5/8-4(c)(1) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016). In addition, because the jury determined that defendant personally discharged a firearm that proximately caused great bodily harm, permanent disability, or permanent disfigurement during the commission of the offense, defendant was subject to an enhancement of 25 years or up to a term of natural life. 720 ILCS 5/8-4(c)(1)(D) (West 2016). Thus, defendant was subject to a prison term of between 31 years and natural life. Defendant's sentence of 45 years' imprisonment fell towards the lower end of this range.

¶ 72    Indeed, in fashioning the sentence imposed in this case, the trial court stated that it had considered the arguments of counsel at the sentencing hearing, the applicable law, the cost of

incarceration, the evidence introduced at the sentencing hearing, and the PSI report. The court referenced defendant's family history, his marital status, his education level, his employment history, and the fact that he had furthered his education in jail and obtained certificates of study. However, the court characterized defendant's attitude, as referenced in the PSI report, as "troubling." The court noted, for instance, that while defendant told the probation officer that he provided several warnings before shooting Peterson, there was no evidence to support this claim. Similarly, the court found no evidence to support defendant's claims that he had been "railroaded" and that the conviction was "way overdone." The trial court also considered the factors in mitigation and aggravation. See 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2016). In mitigation, the court noted that while defendant had a history of prior criminal activity, it was "minor" and most of it was "extremely old." 730 ILCS 5/5-5-3.1(a)(7) (West 2016). Citing the "unique circumstance" of the offenses, the court also determined that defendant's criminal conduct was a result of circumstances unlikely to recur. 730 ILCS 5/5-5-3.1(a)(8) (West 2016). The court determined that there were no other mitigating factors that applied. In aggravation, the court found that the sentence was necessary to deter others from committing the same crime (730 ILCS 5/5-5-3.2(a)(7) (West 2016)) and that defendant's conduct caused serious harm (730 ILCS 5/5-5-3.2(a)(1) (West 2016)). Regarding the latter aggravating factor, defendant shot Peterson in the head. The court found that Peterson "has suffered about as extreme amount of great bodily harm as a person could suffer without losing his life." The shooting left Peterson paralyzed and resulted in him losing an eye and a portion of his skull. In addition, Peterson suffers from cognitive deficits, short-term memory problems, diabetes insipidus, and seizures. The seriousness of the offense and the degree or harm caused by the defendant are the most important factors in fashioning a defendant's sentence. *People v. Saldivar*, 113 Ill. 2d 256, 263 (1986); *People v. Watt*, 2013 IL App (2d) 120183, ¶ 50.

Based on the evidence presented at the sentencing hearing, we cannot say that the sentence imposed by the trial court is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.

¶ 73    Defendant nevertheless argues that the court abused its discretion by imposing a sentence for attempt (first-degree murder) that was over three times the minimum sentence. In support of his claim that his sentence is excessive, defendant cites evidence that: (1) he does not have a "prior serious criminal background;" (2) he has been gainfully employed his entire adult life; (3) he has strong support from family and friends who vouched for his character; and (4) his criminal conduct was a result of circumstances unlikely to occur. Defendant is, in essence, asking us to reweigh the evidence presented to the trial court and assign greater weight to the evidence he cites than did the trial court. However, as noted above, as a reviewing court, we simply are not permitted to do this. *Alexander*, 239 Ill. 2d at 213.

¶ 74    In short, given the trial court's careful consideration of the evidence presented by the parties at the sentencing hearing, we hold that the trial court did not abuse its discretion in sentencing defendant to 45 years' imprisonment.

¶ 75                                    III. CONCLUSION

¶ 76    For the reasons set forth above, we affirm the judgment of the circuit court of DeKalb County.

¶ 77    Affirmed.